# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00659-CV

**Employees Retirement System of Texas, Appellant**

**v.**

**Cynthia A. Garcia, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
### NO. D-1-GN-11-002265, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## O P I N I O N

This appeal presents questions of first impression regarding the availability of occupational-disability retirement benefits for Texas state employees following 2003 amendments that significantly limited the statutory definition of an "occupational disability." As amended, the definition requires that an "occupational disability" "result[] . . . solely from an extremely dangerous risk of severe physical or mental trauma . . . that is not common to the public at large and that is peculiar to and inherent in a dangerous duty that arises from the nature and in the course of a person's state employment."[1] The most pivotal question we answer concerns the extent to which this limitation serves to exclude any disability that can be attributed wholly or partly to an employee's own injury-producing conduct or instead comprehends that the employee's injury-producing conduct may be a component of the risk from which a disability must "solely" result. We conclude that the

---

[1] Act of June 1, 2003, 78th Leg., R.S., ch. 1111, § 10, sec. 811.001(12), 2003 Tex. Gen. Laws 3178, 3180 (codified at Tex. Gov't Code § 811.001(12)).

answer depends on the circumstances underlying each claim for occupational-disability retirement benefits. Under the particular circumstances here, we cannot conclude that the agency administering such benefits, the Employees Retirement System of Texas (ERS), exceeded its lawful discretion in denying a claim for occupational-disability retirement benefits in light of injury-producing conduct by the claimant.

## BACKGROUND

The material facts underlying this appeal are largely undisputed. In 2004, the eventual claimant, appellee Cynthia Garcia, began working as a prison guard for the Texas Department of Criminal Justice (TDCJ). Following a training period, she was assigned to TDCJ's Darrington Unit, a prison facility located in Brazoria County about 30 miles south of Houston. Garcia's duties included conducting surveillance of the facility and surrounding area from a position in one of several guard towers, termed a "perimeter picket" in TDCJ parlance. On July 6, 2005, Garcia accidentally fell from one of these guard towers while on duty, causing her serious injuries and giving rise to her claim. The specific layout and dimensions of the guard tower from which Garcia fell are significant to both the parties' respective legal arguments and an understanding of how the accident occurred.

The guard tower, originally built in the 1960s, consists of an 8-by-8 foot room (also termed a "guard area") surrounded by a balcony or catwalk and perched atop a 16-foot-tall brick structure with a concrete base. The walls of the elevated guard area consist of brick from the floor up to roughly waist level, then large windows extending upward to the ceiling. A doorway in one of the walls allows access to the balcony. The room is not air-conditioned—according to Garcia, a precaution to ensure that guards can carefully monitor sounds outside, albeit one ensuring discomfort

2

for the guards amid the heat and humidity of Brazoria County's warmer months. The guards can obtain some relief, however, by opening windows in the guard area to improve ventilation and perhaps catch a breeze.

The elevated guard area is accessed from ground level by entering a secured metal door leading into the tower base and climbing a 16-foot vertical ladder that is mounted to an interior wall of the structure. At the top of the ladder is a trapdoor (termed a "perimeter picket hatch cover" by TDCJ) that is opened upward to allow entry into the elevated room through an opening in the floor that emerges in one of the room's four corners. This opening in the corner of the floor is roughly two feet-by-two feet in dimensions, thus occupying roughly one-fourth of the floor space along each of the two exterior walls that converge there, and comprising one-sixteenth of the room's total floor area.

Within the room, access to the opening is restricted by—in addition to the two adjacent exterior walls—a metal railing, bolted to the floor, that extends inward perpendicularly from one of the walls at roughly a waist-high level. When opened, the trapdoor's cover can be temporarily attached to this railing with a "locking device." The other interior side of the opening is not permanently obstructed, so as to allow ingress and egress, but can be temporarily cordoned off with a metal chain emanating from the interior end of the railing that can be attached to the wall opposite the railing. The parties agree, however, that this chain would not alone physically prevent a guard from accessing or falling into the opening, although it might provide a visual or tactile reminder of its proximity, akin to a warning track in baseball.

Garcia's accident occurred following a shift change in which she had relieved another guard from duty in the tower. TDCJ procedures required Garcia to leave the trapdoor cover locked

3

open until the other guard departed down the ladder and safely reached the ground below, then close the cover and leave it so until Garcia herself was relieved from duty. As Garcia stood near the opening awaiting the other guard's departure, her colleague began attempting to climb down the ladder while carrying a large bag containing personal belongings. Despite Garcia's offer to simply lower the bag on a rope, the departing guard insisted on struggling down the ladder with her bag. As her colleague's slower-than-normal descent continued, Garcia stepped out onto the balcony to signal an officer at another post to send up some ice to her. In a subsequent written statement, Garcia recounted what happened next:

> After a few minutes I was not able to get the officer's attention and stepped inside [the] tower to drink water from my water jug. By this time [the departing guard] had made it down [the ladder] safe and left [the tower] but I had also forgotten the trap door was still open. I was drinking water when I noticed a closed window so I set my water jug down, walked over to the window and walked right into the opening in the floor.

Garcia fell through the uncovered opening to the concrete floor 16 feet below. She suffered serious injuries that have since led to multiple surgeries with multiple complications and lasting physical impediments that were found to include a limited ability to stand and walk, chronic swelling in her lower right extremity, chronic infections, and pain. She was forty-three years of age at the time of her fall.

Among the financial compensation or benefits that are potentially available to state employees who suffer serious workplace injuries, the Legislature has provided them "occupational disability" retirement benefits—a lifetime monthly retirement annuity, available "regardless of age or amount of service credit," for state employees who are determined to be "permanently incapacitated from the further performance of duty" (a/k/a "disabled") and whose disability also satisfies a

4

statutory definition of an "occupational disability."[2] Since 2003, and for purposes of this appeal, the

Legislature has defined "occupational disability" as:

> [D]isability from a sudden and unexpected injury or disease that results solely from a specific act or occurrence determinable by a definite time and place and solely from an extremely dangerous risk of severe physical or mental trauma or disease that is not common to the public at large and that is peculiar to and inherent in a dangerous duty that arises from the nature and in the course of a person's state employment.[3]

A state employee who meets these requirements is entitled to a monthly annuity equal to at least the

greater of 35% of his or her average monthly salary or $150.[4] Where the qualifying employee is a

peace officer, however, the Legislature has provided an enhanced monthly benefit if the officer's

"occupational disability result[s] from a risk to which law enforcement or custodial officers are

exposed because of the nature of law enforcement or custodial duties."[5] As with other retirement

benefits for state employees, the occupational disability retirement benefits program is administered

by appellee ERS, a statutorily created public corporation governed by a Board of Trustees and

overseen by an Executive Director.[6]

Following her accident, Garcia made application to ERS for occupational-disability

retirement benefits with the enhancement provided to qualifying peace officers.[7] Agency staff

---

[2] *See* Tex. Gov't Code §§ 814.202(b), (c), .203, .204, .206.

[3] *Id.* § 811.001(12).

[4] *See id*. § 814.206.

[5] *Id*. § 814.207.

[6] *See generally id*. §§ 811.002–.004, 814.001, 815.101, 815.202.

[7] *See id*. § 814.201 (requiring application). ERS asserts that if Garcia's claim is successful, she would receive a monthly annuity equal to 100% of her monthly salary prior to her injury.

denied the application. Garcia appealed that decision to the ERS Board of Trustees, and the matter was referred to the State Office of Administrative Hearings (SOAH) for a contested-case hearing governed by the Administrative Procedure Act (APA).[8] By statute, Garcia bore the burden of proof on all issues.[9]

ERS does not contest (at least for purposes of this appeal) that Garcia proved she has a "disability"[10] and that, as required by the applicable statutory definition of "occupational disability," her "disability" is "from a sudden and unexpected injury or disease that results solely from a specific act or occurrence determinable by a definite time and place,"[11] namely the serious injuries she suffered in her fall. The dispute on appeal, rather, centers on the extent to which Garcia met her burden regarding the remaining components of the "occupational disability" definition, specifically:

(1)    Whether Garcia's working conditions in the guard tower presented "an *extremely dangerous* risk of severe physical or mental trauma or disease that is not common to the public at large and that is peculiar to and inherent in a dangerous duty that arises from the nature and in the course of a person's state employment."[12]

---

[8] *See id*. § 815.511(a)–(c) (administrative decision and appeal); *see generally id*. §§ 2001.051–.147 (APA provisions regarding contested-case hearings).

[9] *See id*. § 815.511(c).

[10] *See id*. § 814.202(b).

[11] *See id*. § 811.001(12).

[12] *See id*. (emphasis added).

(2)    If so, whether Garcia's "disability from [her] sudden and unexpected injury" (i.e., her fall and its consequences) could be said to "result[] . . . *solely* from" that "extremely dangerous risk."[13]

The parties similarly join issue as to whether Garcia met her burden to prove that her "disability," if qualifying as an "occupational disability," could be said to "result from a risk to which [she was] exposed because of the nature of law enforcement or custodial duties," as required for her to obtain the enhanced benefits.[14]

ERS's basic theme was that Garcia bore at least some of the blame for her fall, if not all of it, such that the fall could not be attributed "solely" to any risk associated from her working conditions in the guard tower. It emphasized Garcia's acknowledgments that she had left the trapdoor cover open, forgotten about it, and overlooked the opening before falling through. To similar effect, ERS presented testimony from a TDCJ safety officer who had investigated the incident, Mike Dattalo. Dattalo explained that Darrington prison guards like Garcia had been required to follow written safety standards regarding the trapdoor covers, known as "Standard Operating Procedures for Employee Safety" (SOPs), which prescribed the following protocol during shift changes in the guard towers:

1.    When the relieving officer arrives, the on duty officer shall lower the picket key as outlined in the S.O.P. for transferring security equipment to and from perimeter pickets.

2.    When the relieving officer has entered the bottom of the picket and secured the door, [t]he on duty officer shall open the hatch cover.

---

[13]    *See id.* (emphasis added).

[14]    *See id.* § 814.207(a).

7

3.       When the relieving officer reaches the top of the picket, the on duty officer shall close the hatch cover.

      a.      Using the handle provided, gently lower the hatch cover. Never slam or allow the hatch cover to fall.

4.       The picket officers shall then conduct the picket inspection as outlined in the Post Orders for perimeter pickets.

5.       After the picket inspection is complete the on duty officer shall open the hatch cover as outlined in 2a. above.

6.       The on duty officer shall ensure that the leaving officer has safely descended the ladder to the bottom of the picket.

7.       The on duty officer shall then close the hatch cover as outlined in 3a. above.

8.       The on duty officer shall retrieve the picket key from the leaving officer as outlined in the S.O.P. for transferring security equipment to and from perimeter pickets.

NOTE:      The hatch cover shall remain closed for the entire tour of duty.

According to Dattalo, Garcia had violated the SOPs by failing to close the trapdoor cover after her departing colleague had descended the ladder. He had further determined that Garcia had been "unobservant, daydreaming, inattentive, etc.," and recommended her for TDCJ discipline. Dattalo also found fault with Garcia's failure to put up the chain while the hatch cover was open. While acknowledging that the chain in itself was insufficient as a physical barrier to prevent a person from falling through the opening, Dattalo reasoned that it would nonetheless have served to remind her that the opening was nearby. Assuming these precautions were followed, Dattalo insisted, there was nothing "extremely dangerous" about Garcia's working environment in the guard tower.

While conceding that she had left the trapdoor cover open and forgotten about it, Garcia disputed the extent of her culpability and its legal significance under the relevant statutory

8

standards. Garcia presented the testimony of a safety expert and attorney, Katherine Rogers-Fjelstad, who opined that the trapdoor presented an "extremely dangerous risk" to prison guards and that TDCJ had taken inadequate measures to make it safer, such as by installing a spring-loaded railing on the open side, relying instead on the chain, which had to be latched and would not be a barrier to a fall in any event. Although acknowledging that Garcia's human error had played a role in her fall and that she might have prevented it by closing the trapdoor cover and paying better attention to where she was walking, Rogers-Fjelstad suggested that the possibility of such distraction or other human error was merely a component of the underlying risk of working in the guard tower. While such inadvertence was perhaps a "causal factor" preceding Garcia's fall, it did not, in the expert's view, diminish or change the underlying "root cause" of the accident, the dangers presented by an inadequately guarded floor opening.

The Administrative Law Judge (ALJ) issued a proposal for decision (PFD) recommending that the ERS Board grant Garcia's application for enhanced occupational-disability retirement benefits. In support, the ALJ made fact findings regarding the basic setting[15] and

---

[15] The ALJ found:

14. In 2004, Ms. Garcia trained to become a corrections officer with TDCJ. Late that year she began working at TDCJ's Darrington Unit in Rosharon, Brazoria County.

15. Ms. Garcia's job was to watch over inmates. As part of her duties, she was assigned to conduct surveillance from a guard tower. She was to monitor outside activity and prevent escapes.

16. The guard tower in which Ms. Garcia worked is a tall building with a vertical ladder leading to the elevated area for the guards. The guards' area is approximately eight feet long by eight feet wide.

circumstances of Garcia's fall[16] that are generally consistent with our description above, plus

17.    The ladder, which is affixed to the interior of one of the tower's walls, is approximately 16 feet tall. At its upper end, the ladder leads to an opening in the floor of the guards' area.

18.    The hole in the floor is two feet long by two feet wide.

19.    The opening is in the corner of the tower, so at two sides of the opening are the tower's walls. There are windows in those walls, above the hole, with the bottoms of the windows at about waist level. On a third side of the opening is a metal railing that is bolted into the floor. A chain is available for fastening, from the railing to the wall opposite, across the fourth side of the opening.

20.    The hole has a trapdoor that opens upwards and can be hooked onto the railing to stand open.

21.    The floor at the base of the tower is concrete.

22.    There is no air conditioning in the tower.

[16] The ALJ further found:

23.    On July 6, 2005, Ms. Garcia went to the guard tower to relieve another guard, Officer Hampton.

24.    Ms. Garcia climbed up into the tower, and Officer Hampton then began trying to climb down the ladder.

25.    Officer Hampton was having difficulty climbing down because she was struggling to carry a large bag full of her belongings.

26.    Ms. Garcia stood at the opening, offering to help pass the bag down, but Officer Hampton kept trying to get down with the bag on her own.

27.    As Officer Hampton continued to try to climb down, Ms. Garcia stepped to the balcony to signal to the gate officer to send up some ice.

28.    Ms. Garcia came in from the balcony and stepped across the tower to get some water.

29.    Then, she went to open one of the windows to let in a breeze.

the following findings of immediate relevance to this appeal:

31.  [Upon reentering the guard area from the balcony,] Ms. Garcia forgot that the trapdoor was still open, and she walked across the opening and fell to the floor at the base of the tower.

32.  A ladder cage or gate with a spring-loaded closing mechanism would have provided protection against an accidental fall through the hole.

33.  The Darrington Unit's Standard Operating Procedures (SOP) for tower trapdoors require[] the newly on-duty officer to keep the trapdoor open until the leaving officer has safely descended the ladder to the bottom, as Ms. Garcia did.

34.  Nothing in the SOP prohibits an officer's stepping away while the leaving officer is descending the ladder, and nothing in it requires (or even mentions) the use of the chain [to cordon off the trapdoor area].

35.  Ms. Garcia did not violated the SOP.

. . .

43.  Ms. Garcia's injury resulted solely from the risk of working in a small, elevated, hot space reachable only by a ladder, with a poorly guarded trapdoor that must remain open while a leaving officer is descending.

Based on her findings, the ALJ concluded that Garcia's fall and subsequent disability met the statutory definition of "occupational disability" and that, similarly, she had been disabled "as a direct result of a risk or hazard to which law enforcement or custodial officers are exposed because of the nature of law enforcement or custodial duties," thus qualifying for enhanced benefits.

The Legislature has explicitly authorized the ERS Board, "in its sole discretion," to "make a final decision on a contested case" and to "modify, refuse to accept, or delete any proposed finding of fact or conclusion of law contained in a proposal for decision," provided it "state[s] in

---

30.  By now, Officer Hampton had gone.

writing the specific reason for its determination."[17]  The Board may also delegate this authority to the ERS Executive Director.[18]  Acting under color of these statutory authorizations, the Executive Director, on the Board's behalf, rejected the ALJ's proposed decision and underlying findings and conclusions, adopted alternative findings and conclusions proposed by ERS's general counsel, and issued an order denying Garcia's claim in full.  The net effect of the alternative findings and conclusions adopted by the Executive Director was to leave undisturbed the majority of the ALJ's proposed findings and conclusions while changing certain others that had been pivotal to the ALJ's reasoning and ultimate decision.  Substantive modifications to the ALJ's fact findings were as follows (additions are indicated by <u>underline</u>; deletions by <s>strikeout</s>):

35.  Ms. Garcia did <s>not</s> violate the SOP <u>by failing to close the picket hatch cover after the other officer descended</u>.

36.  <u>[Garcia] would have had additional protection against the fall that caused her injury had she put up the chain.</u>

37.  <u>[Garcia] could have prevented the fall that caused her injury by exercising ordinary care to maintain a proper lookout and thereby avoid stepping into the picket hatch opening.</u>

. . .

45.[[19]] Ms. Garcia's injury <u>did not</u> result<s>ed</s> solely from the risk of working in a small, elevated, hot space reachable only by a ladder, with a poorly guarded trapdoor that must remain open while a leaving officer is descending.  <u>Her injury was caused substantially, if not solely, by her own negligence in failing to timely close the picket hatch cover, failing to put up the chain, and/or</u>

---

[17]  Tex. Gov't Code § 815.511(d).

[18]  *See id.*

[19]  Renumbered from 43.

12

> failing to keep a proper lookout to avoid stepping into the picket hatch opening.

46. The open picket hatch cover did not present an extremely dangerous risk of severe physical or mental trauma because the risks could be easily avoided by [Garcia]'s exercise of ordinary care.

Corresponding modifications to the ALJ's following proposed conclusions of law were:

5. Ms. Garcia suffered a sudden and unexpected injury that resulted solely from a specific act or occurrence determinable by a definite time and place ~~and,~~ but not solely from an extremely dangerous risk of severe physical trauma that is not common to the public at large and that is peculiar to and inherent in a dangerous duty that arose from the nature and in the course of her state employment.

7. Ms. Garcia is not disabled as a direct result of a risk or hazard to which law enforcement or custodial officers are exposed because of the nature of law enforcement or custodial duties. Tex. Gov't Code § 814.207.

8. Ms. Garcia's appeal should be ~~granted~~ denied, and the decision of the ~~Executive Director~~ Director of Customer Benefits denying Ms. Garcia's occupational disability retirement benefits should be ~~reversed~~ upheld by the designee of the Board of Trustees of ERS.

Each change was accompanied by a detailed explanation of the Executive Director's reasoning.

After exhausting her remaining administrative remedies, Garcia filed suit for judicial review of ERS's final order in Travis County district court.[20] The district court reversed the final order and remanded the matter to ERS for further proceedings. Its judgment elaborated that the Executive Director had, in the court's view, "erred," acted arbitrarily and capriciously or with an abuse of discretion, "or both," in four respects:

---

[20] *See* Tex. Gov't Code § 815.511(f) (providing to "person aggrieved by a final decision of [ERS] in a contested case" right to judicial review under APA in Travis County district court).

13

•   Rejecting the ALJ's "correct[] interpret[ation]" of the statutory definition of "occupational disability," which had recognized that "the distraction that caused Ms. Garcia to forget that the trapdoor was open was not an independent cause of the accident, but rather was *part of* the risk of working around the trapdoor in the conditions in that tower," and instead holding that Garcia did not satisfy the "'solely from an extremely dangerous risk' prong" of the definition.

•   Determining that the risk Garcia faced while working around the trapdoor in the conditions in the guard tower did not constitute an "extremely dangerous risk" under the statutory definition of "occupational disability."

•   Determining that Garcia did not qualify for enhanced occupational disability retirement benefits.

•   Modifying the ALJ's proposed findings of fact and conclusions of law.

This appeal ensued.

## ANALYSIS

ERS challenges the district court's judgment through five issues on appeal. In its first issue, ERS urges that in the face of evidence of Garcia's "contributory negligence in failing to close the trap door, keep a proper lookout, or engage the chain," the Executive Director did not reversibly err (or act arbitrarily or capriciously, abuse her discretion, etc.) in denying benefits on the basis that Garcia's injuries did not "result . . . *solely* from" any risk of working in the guard tower, as the statutory definition of "occupational disability" required. In its second issue, ERS disputes whether the conditions in the guard tower constituted an "extremely dangerous risk" within the meaning of the definition. In its third issue, ERS contends that even if Garcia somehow qualified for occupational disability retirement benefits, substantial evidence supports the Executive Director's determination that Garcia did not meet the additional requirements for enhanced benefits.

14

ERS's remaining issues challenge the district court's holding that the Executive Director had erred or exceeded her lawful discretion in altering the ALJ's proposed findings and conclusions. In its fifth issue, ERS argues that Garcia waived any such complaint by failing to assert it in her motion for rehearing before the agency. In its fourth issue, ERS asserts that even if the complaint was preserved, the Executive Director did not err in altering the ALJ's findings and conclusions as she did.

**Standard of review**

We review ERS's final order under the "substantial evidence" standard that is codified in the APA.[21] This standard requires that we reverse or remand a case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are:

(A)     in violation of a constitutional or statutory provision;

(B)     in excess of the agency's statutory authority;

(C)     made through unlawful procedure;

(D)     affected by other error of law;

(E)     not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F)     arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.[22]

---

[21]   *See id*. §§ 815.511(f) ("On judicial appeal [of an ERS final decision] the standard of review is by substantial evidence."), 2001.174 (codifying "substantial evidence" standard).

[22]   *Id.* § 2001.174(2).

15

Essentially, this is a rational-basis test to determine, as a matter of law, whether an agency's order finds reasonable support in the record.[23] "The test is not whether the agency made the correct conclusion in our view, but whether some reasonable basis exists in the record for the agency's action."[24] We apply this analysis without deference to the district court's judgment.[25] We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the burden is on the contestant to demonstrate otherwise.[26] Ultimately, we are concerned not with the correctness of the Commission's decision, but its reasonableness.[27]

Substantial-evidence analysis entails two component inquiries: (1) whether the agency made findings of underlying facts that logically support the ultimate facts and legal conclusions establishing the legal authority for the agency's decision or action and, in turn, (2) whether the findings of underlying fact are reasonably supported by evidence.[28] The second inquiry, which has been termed the "crux" of substantial-evidence review,[29] is highly deferential to the agency's determination: "substantial evidence" in this sense "does not mean a large or

[23] *See Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452–53 (Tex. 1984).

[24] *Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 549 (Tex. App.—Austin 2011, pet. denied).

[25] *See Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam).

[26] *See Slay*, 351 S.W.3d at 549.

[27] *See Sanchez v. Texas State Bd. of Med. Exam'rs*, 229 S.W.3d 498, 510 (Tex. App.—Austin 2007, no pet.).

[28] *See Vista Med. Ctr. Hosp. v. Texas Mut. Ins. Co*, 416 S.W.3d 11, 26–27 (Tex. App.—Austin 2013, no pet.) (citing *Charter Med.-Dallas*, 665 S.W.2d at 453).

[29] *See Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.) (citing John E. Powers, *Agency Adjudications* 163 (1990)).

16

considerable amount of evidence"—in fact, the evidence may even preponderate against the agency's finding—but requires only "such relevant evidence as a reasonable mind might accept as adequate to support a [finding] of fact."[30] Likewise, we "may not substitute [our] judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion."[31] In contrast, the first inquiry, concerning the extent to which the underlying facts found by the agency logically support its ultimate decision or action, may entail questions of law that we review de novo.[32]

Although both parties emphasize findings and supportive "substantial evidence" they perceive favorable to their respective positions, the legal materiality of any such facts ultimately depends upon construction of the statutes governing Garcia's entitlement to benefits, beginning with the statutory definition of "occupational disability." Statutory construction presents a question of law that we review de novo.[33] Our primary objective in statutory construction is to ascertain and give effect to the Legislature's intent.[34] We determine that intent from the plain meaning of the words

---

[30] *Slay*, 351 S.W.3d at 549.

[31] Tex. Gov't Code § 2001.174(1).

[32] *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011); *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 565 (Tex. 2000) (citing *Charter Med.-Dallas*, 665 S.W.2d at 453); *City of El Paso v. Public Util. Comm'n*, 344 S.W.3d 609, 619 (Tex. App.—Austin 2011, no pet.); *Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd.*, 156 S.W.3d 91, 99 (Tex. App.—Austin 2004, pet. denied).

[33] *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006).

[34] *See id.*; *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) (citing Tex. Gov't Code § 312.005; *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 176 (Tex. 2004)).

17

chosen when it is possible to do so, using any definitions provided.[35] We consider the statutes as a whole rather than their isolated provisions.[36] We presume that the enactment's language was chosen with care, with each word included (or omitted) purposefully.[37] Undefined terms are typically given their ordinary meaning, but if a different or more precise definition is apparent from a term's use in context, we apply that meaning.[38] If the text of the enactment is unambiguous, we adopt the interpretation supported by its plain language unless such an interpretation would lead to absurd results that the drafters could not possibly have intended.[39] However, if the text is ambiguous—i.e., there is more than one reasonable interpretation of it—we may be required to defer to an authoritative construction by the agency charged with the provision's enforcement that is reasonable and not inconsistent with the text of the provision.[40] Such deference is particularly appropriate where the statutes and rules at issue concern a matter within the core expertise of the agency.[41]

---

[35] *See TGS-NOPEC*, 340 S.W.3d at 439 (citing Tex. Gov't Code § 312.011(b)).

[36] *See id.* (citing *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004)).

[37] *See id.* (citing *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008)).

[38] *See id.* (citing *In re Hall*, 286 S.W.3d 925, 928–29 (Tex. 2009)).

[39] *See id.* (citing *Mega Child Care*, 145 S.W.3d at 177); *see also Texas Coast Utils. Coal. v. Railroad Comm'n*, 423 S.W.3d 355, 356 n.16 (Tex. 2014) (noting that principles of deference to agency construction not implicated where statute at issue is unambiguous).

[40] *See Texas Citizens*, 336 S.W.3d at 628–30; *see also TGS–NOPEC*, 340 S.W.3d at 439 ("If there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, . . . we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule.").

[41] *See Zimmer US, Inc. v. Combs*, 368 S.W.3d 579, 586 (Tex. App.—Austin 2012, no pet.) (deferring to Comptroller's reasonable interpretation of ambiguous tax statute); *cf. Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.) (declining to

**"Results . . . solely from an extremely dangerous risk"**

We will begin with ERS's arguments rooted in construction of the definitional phrase "disability from a sudden and unexpected injury or disease that *results . . . solely* from an extremely dangerous risk of severe physical or mental trauma or disease that is not common to the public at large and that is peculiar to and inherent in a dangerous duty that arises from the nature and in the course of a person's state employment," the focus of its first issue. Assuming for purposes of argument that the working conditions in the guard tower presented "an extremely dangerous risk of severe physical or mental trauma . . ." (the focus of its second issue), ERS disputes that Garcia's fall and resultant disability can be said to "result[] . . . solely" from that risk. This is so, ERS reasons, because the Executive Director found, with support by substantial evidence, that Garcia's own "contributory negligence" or lack of care in failing to close the trapdoor cover, engage the chain, or keep a proper lookout were a contributing cause of her fall, if not the sole cause.

ERS's argument is premised in part on the view that "result[] . . . solely from an extremely dangerous risk," as used in the "occupational disability" definition, was intended to impose a strict "sole-cause" standard that precludes recovery if any causal factor other than the underlying workplace risk contributes to an employee's disability-causing injury or disease. It insists this intent is evident in the Legislature's use of the word "solely" in the definition, especially when viewed in the context of the jurisprudence that preceded the 2003 amendments adding that language.

---

defer to agency interpretation on issue outside agency expertise) (citing 2B Norman J. Singer, *Statutes & Statutory Construction* § 49:04, at 23–24 (6th ed. 2000)).

19

ERS emphasizes this Court's 2002 decision in *Flores v. Employees Retirement System*,[42] in which we construed a prior version of the "occupational disability" definition that provided:

> "Occupational death or disability" means death or disability from an injury or disease that *directly* results from a specific act or occurrence determinable by a definite time and place, and *directly* results from a risk or a hazard peculiar to and inherent in a duty that arises from and in the course of state employment.[43]

A central issue in *Flores* concerned the construction and application of the first "prong" of the definition (then requiring that the disability be from "injury or disease that directly results from a specific act or occurrence") to an occupational-disability-retirement claimant whose disability was traceable in part to a preexisting condition.[44] Citing the preexisting condition, ERS had denied the claim in the view that the claimant's disability could not be said to "directly result" from the on-the-job car accident that had given rise to her claim. This Court rejected ERS's construction of the definition, holding that the phrase "directly results," without more, did not preclude recovery merely because other causal factors might also be present.[45] It reasoned:

> "Directly" is not synonymous with "solely," and nothing in the plain meaning of the statute mandates disqualifying every claimant who had a preexisting condition that is aggravated by the injury. Had the legislature intended a sole cause standard, it could

---

[42] 74 S.W.3d 532 (Tex. App.—Austin 2002, pet. denied).

[43] Act of May 27, 2001, 77th Leg., R.S., ch. 1231, § 1, sec. 811.001(12), 2001 Tex. Gen. Laws 2827 (emphases added) (current version at Tex. Gov't Code § 811.001(12)).

[44] *See Flores*, 74 S.W.3d at 546.

[45] *See id*. at 547–48.

20

have given some indication, for example, by using "solely results" or "directly results independently of all other causes."  It did not do so.[46]

It was during the Legislature's next regular session that it amended the "occupational disability" definition to substitute "solely" in both places where "directly" had appeared.[47]  ERS insists this change reflected unequivocal intent to impose a sole-cause standard in both "prongs" of the "occupational disability" definition, as if to respond to the *Flores* Court's invitation.  We must assume the Legislature was aware of *Flores* and acted with reference to it, as with other background law.[48]  However, the focus of our inquiry remains the statutory text the Legislature has actually chosen, and while *Flores* might perhaps inform the context of that usage, the decision cannot change the objective meaning of those words altogether.[49]

In response to ERS's arguments, Garcia points out that the "occupational disability" definition, even as amended in 2003, does not refer to "cause" or "causation," but uses the phrase

---

[46] *Id*.; *see also id*. at 547 (observing that "results directly and independently of all other causes" is commonly used in private insurance policies and "has been interpreted to create a sole-cause standard").

[47] *See* Act of June 1, 2003, 78th Leg., R.S., ch. 1111, § 10, sec. 811.001(12), 2003 Tex. Gen. Laws 3178, 3180 (codified at Tex. Gov't Code § 811.001(12)) (among other changes, replacing word "directly" with "solely" to require that injury "results *solely* from a specific act or occurrence" and "*solely* from an extremely dangerous risk") (emphases added).

[48] *See Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, no pet.) ("[W]e assume that when enacting a statute, the legislature was aware of the background law and acted with reference to it." (citing *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990)).

[49] *See, e.g.*, *Molinet v. Kimbrell*, 356 S.W.3d 407, 419–20 (Tex. 2011) (noting supreme court's "reluctan[ce] to look to legislative history to divine the Legislature's meaning" and doing so only because the statute in question created an ambiguity); *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651–52 (Tex. 2006) (noting that while "we may cautiously consult legislative history to help divine legislative intent" where "enacted language is nebulous," the "enacted language is what constitutes the law").

21

"*results* . . . solely from an extremely dangerous risk . . . ." By using "results" rather than "causes," the Legislature, she infers, conspicuously avoided incorporating into the statute the familiar concepts of sole cause, proximate cause, producing cause, intervening or superseding cause, etc., and corollary notions of fault or responsibility on which ERS relies. The *Flores* Court made a similar observation about the pre-2003 definition, noting that "the statute does not define the standard in recognizable terms such as 'sole cause,' 'proximate cause,' or 'producing cause.'"[50] Yet *Flores* also characterized the statutory phrase "directly results" as denoting some sort of "causal nexus."[51] Similarly, ERS questions whether there is any substantive difference between an injury that "results solely" from a risk and one that is "caused solely" (or "solely caused") by it, observing that Black's Law Dictionary defines "cause" in terms of something that brings about a "result."[52]

But the primary thrust of Garcia's argument is not semantics—rather, she insists that ERS assumes a false dichotomy between an injury that "results . . . solely from an extremely dangerous risk" and one in which an injured employee's negligence, inadvertence, or other "human frailty" can be said to play some causal role. In Garcia's view, the "extremely dangerous risk" contemplated by the "occupational disability" definition necessarily encompasses some range of "human frailty," workplace accidents, or mistakes by an injured employee such that an injury can be to some extent attributable to (or be "caused by") a claimant's own errors or deficiencies, yet nonetheless still "result[] . . . solely" from the underlying risks of the workplace so as to permit

---

[50] *Flores*, 74 S.W.3d at 546.

[51] *Id*.

[52] *See* Black's Law Dictionary 265 (10th ed. 2014) (defining "cause" as "[s]omething that produces an effect or result.").

22

recovery. To illustrate the relationship between this sort of contributory employee causation and the underlying risks of the workplace, Garcia offers the example of a prison guard who, upon climbing into the elevated guard area, must immediately respond to a suddenly erupting prisoner riot and, amid the tumult, overlooks the still-opened trapdoor and falls in. A similar illustrative hypothetical, embraced by the district court, posited a hypothetical law enforcement officer who failed to zip up his bulletproof vest in perfect accordance with manufacturer's instructions, leaving a small gap, then was wounded there in a gun battle with criminals. If the statute truly imposed a sole-cause standard along the lines ERS envisions, Garcia urges, neither law enforcement officer could qualify for occupational-disability retirement benefits, despite the obvious and pervasive nexus of their injuries to the serious risks inherent in their work, because their oversight or inadvertence could invariably be said to comprise at least 1% of the cause of their injuries. The net result, Garcia further asserts, would be to bar recovery of virtually all occupational-disability retirement benefits claims, an "absurd result" the Legislature could not possibly have intended.[53]

In response to such arguments, ERS ultimately acknowledges that the "occupational disability" definition would not categorically bar recovery in all cases where a claimant's own "human error" contributed to his or her injuries, but would permit recovery where the error could be said to "result from the unique risk of the job." But ERS insists that Garcia's errors and inadvertence were not the sort that resulted from any "unique risk" of her job, but were the equivalent of the hypothetical law enforcement officer having "failed to secure the vest out of vanity, or because he was looking at FaceBook or some other obvious act of negligence," and he "would

---

[53] *See, e.g.*, *City of Rockwall v. Hughes*, 246 S.W.3d 621, 629 (Tex. 2008) ("[O]ur standard is to construe statutes to effectuate the intent of the Legislature, with the language of the statute as it was enacted to be our guide unless the context or an absurd result requires another construction.").

23

not have otherwise been injured but for that act of negligence." In urging that such negligence was indistinguishable from the underlying risk of her work environment, Garcia, according to ERS, would logically imply that she should recover even if she had jumped into the open trapdoor intentionally because, in her view, it is only the underlying risk of the trapdoor and environs that matters.

As the parties' competing contentions demonstrate, the pivotal issue regarding application of the "result[] . . . solely from an extremely dangerous risk" requirement is not whether Garcia can be said to have acted with "contributory negligence" or have been a "cause" of her own injuries, per se, but whether her acts or omissions are a component of the underlying "extremely dangerous risk of severe physical or mental trauma or disease that is not common to the public at large and that is peculiar to and inherent in a dangerous duty that arises from the nature and in the course of a person's state employment," as we have assumed her working conditions in the guard tower to be. Both parties insist that this statutory language unambiguously supports their position, with Garcia urging that her admitted "human frailty" was plainly part and parcel of the underlying "extremely dangerous risk" of working in a hot, un-airconditioned confined space with an opening in the floor, while ERS maintains that any perils associated with Garcia's working conditions are quite obviously distinct from those she created herself and which led to her fall.

In the alternative, ERS urges that we should defer to its construction of the statute under the principles enunciated by the Texas Supreme Court in the *Texas Citizens* case.[54] Under those principles, as previously noted, courts may be required to defer to an authoritative construction of a statute by the agency charged with the provision's enforcement that is reasonable and

---

[54] 336 S.W.3d at 625–28.

not inconsistent with the provision's text.[55]  However, there are some important caveats to the application of these principles.  For one, such deference is considered appropriate where the statute at issue concerns a matter within the specialized or technical expertise of the agency,[56] and less so where it does not.[57]  Another is that courts do not defer to an agency's construction of an unambiguous statute.[58]  The Texas Supreme Court has restated the latter limitation affirmatively as, "If there is vagueness, ambiguity, or room for policy determination in a statute or regulation, . . .we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule."[59]

We conclude that the statutory definition of "occupational disability," as amended in 2003, is one where the Legislature has left some "vagueness, ambiguity, or room for policy interpretation" with respect to whether a claimant's own injury-producing conduct in a given case is or is not a component of an underlying "extremely dangerous" workplace risk from which a disability must "solely" result.  We further observe that construction and application of this statute lies within the expertise of ERS, the agency charged with administering state employee insurance and retirement benefits and having been delegated exclusive jurisdiction to initially decide claims for

---

[55] *See id*. at 628–30.

[56] *See Zimmer*, 368 S.W.3d at 586.

[57] *Fisher Controls*, 45 S.W.3d at 302.

[58] *Texas Citizens*, 336 S.W.3d at 625; *see also Texas Coast Utils. Coal.*, 423 S.W.3d at 356 n.16 (noting that principles of deference to agency construction not implicated where statute at issue is unambiguous).

[59] *TGS-NOPEC*, 340 S.W.3d at 438.

benefits.[60]  At bottom, the issue presented by Garcia's benefits claim is one of risk-allocation within the insurance and retirement systems ERS administers and, more generally, the Executive Branch's management of the public fisc under the authority delegated to it by the Legislature—whether the particular circumstances of her fall and ensuing disability are, or are not, the sort of workplace risk against which the Legislature undertook to indemnify state employees by providing occupational-disability retirement benefits.  These are the sorts of questions on which generalist courts should defer to ERS's reasonable construction of the statute.[61]

Garcia urges, however, that the relevant issue is "statutory construction," and that courts, not agencies, are the proper arbiters in that regard.  She admittedly finds support for that notion in *Flores*, in which this Court asserted that because statutory construction "does not involve a matter lying within the [ERS] Board's expertise," "courts are as competent as the Board in assessing legislative intent and this reduces considerably the degree of deference owed the Board's interpretation of [the 'occupational disability' definition."[62]  However, in light of intervening Texas Supreme Court decisions like *Texas Citizens*, the *Flores* court's view would necessarily apply

---

[60]  *See, e.g.*, *Blue Cross Blue Shield v. Duenez*, 201 S.W.3d 674, 676–77 (Tex. 2006) (per curiam).

[61]  *See Texas Citizens*, 336 S.W.3d at 624–33 (holding that agency's construction of statute it was charged with enforcing was entitled to deference because it was reasonable, in line with the statute's meaning, and related to its expertise); *AEP Tex. Commercial & Indus. Retail Ltd. P'ship v. Public Util. Comm'n*, 436 S.W.3d 890, 906–07 (Tex. App.—Austin 2014, no pet.); *see Zimmer*, 368 S.W.3d at 586.

[62]  *Flores*, 74 S.W.3d at 546.

only to the extent the statute at issue is unambiguously contrary to the agency's view of it.[63]  That is not the case here.

We likewise cannot conclude that ERS construed and applied the "occupational disability" definition unreasonably or inconsistently with its text in determining that Garcia's fall and ensuing disability are not the sort of workplace risk against which the Legislature undertook to indemnify state employees by providing occupational-disability retirement benefits.  While there were certainly perils associated with the presence of a trapdoor within the confined space in which Garcia worked, the Executive Director found that she could have prevented her accident by simple measures like closing the trapdoor cover before exiting the guard area for the balcony and keeping a proper lookout after she returned.  Garcia does not seriously dispute that substantial evidence supports these findings of underlying fact.

Garcia asserts, however, that the Executive Director acted improperly in adopting her version of the findings and conclusions in lieu of those proposed by the ALJ.  The district court evidently agreed, and ERS has challenged this holding in its fourth and fifth issues, the former attacking the ruling on the merits while the latter contends Garcia waived the issue.  We need go no farther than to observe, again, that the Legislature has granted the ERS Board (who may delegate the authority to the Executive Director[64]) the "sole discretion [to] make a final decision on a contested case" and "may in its sole discretion modify, refuse to accept, or delete any proposed finding of fact or conclusion of law contained in [an ALJ's PFD]" or "make alternative findings of fact

_____

[63]  *See AEP Tex.*, 436 S.W.3d at 906–07.

[64]  *See* Tex. Gov't Code § 815.511(d).

27

and conclusions of law."[65]  If it chooses to do so, the Board or Executive Director must provide "the specific reason for its determination."[66]  Here, the Executive Director gave detailed explanations and reasons for the changes she adopted.  For example, regarding Finding of Fact 45 (previously numbered 43), the Executive Director explained:

> Proposed Alternative No. 45 [is] modified . . . because the failure to include a finding that Appellant's own negligence substantially, if not solely, caused her injury is clearly erroneous, against the weight of the evidence, based on an insufficient review of the evidence, and incomplete.  The evidence shows that it was Appellant's negligence, and not an extremely dangerous condition, that caused the accident.  The evidence shows that Appellant's negligence in not closing the picket hatch cover, not putting up the chain, and/or not exercising ordinary care by keeping a proper lookout to avoid stepping into the picket hatch opening were causes of the accident.  The ALJ did not include such a finding in the ALJ's Proposed FOF even though the weight of the evidence reflects that Appellant's injury resulted substantially, if not solely, from her own negligence.  Not including such a finding also reflects an insufficient review of the evidence and makes the ALJ's Proposed FOF No. 43 confusing, incomplete and misleading. . . . .

In the context of her permissible construction of the "occupational disability" definition, the Executive Director's modified findings comported with the statutory requirements.  We sustain ERS's fourth issue and need not reach its fifth.

In light of the Executive Director's valid findings and the agency's reasonable construction of the underlying statutory requirement that Garcia's disability "result[] . . . solely" from the underlying risk of her workplace, we sustain ERS's first issue.  Because that holding is fatal to Garcia's entitlement to occupational-disability retirement benefits, we need not reach either ERS's second issue (concerning whether Garcia's working conditions in the guard tower presented an

---

[65] *Id.*

[66] *Id.*

"exceptionally dangerous risk"), nor its third issue (challenging Garcia's further entitlement to enhanced benefits).[67]

## CONCLUSION

We reverse the district court's judgment and render judgment affirming ERS's final order.[68]

_____
Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Rose

Reversed and Rendered

Filed:   December 18, 2014

---

[67]  *See* Tex. R. App. P. 47.1.

[68]  *See* Tex. Gov't Code § 2001.174(1).