# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00718-CV

**Citizens Against the Landfill in Hempstead; Michael McCall;
Wayne Knox; and the City of Hempstead, Appellants**

**v.**

**Texas Commission on Environmental Quality and Pintail Landfill, L.L.C., Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
### NO. D-1-GN-13-002918, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is a suit for judicial review of the Texas Commission on Environmental Quality's issuance of Municipal Solid Waste Registration No. 40259 (the Registration) to Pintail Landfill, L.L.C. Citizens Against the Landfill in Hempstead, Mike McCall, and Wayne Knox (collectively, CALH) and the City of Hempstead appeal from the district court's judgment affirming the Commission's decision. We will affirm the district court's judgment.

## BACKGROUND

In August 2011, Pintail submitted to the Commission an application for a registration authorizing a Type V Transfer Station to be located on Highway 6 in Waller County (the Facility).[1]

---

[1] Commission rules define a "transfer station" as "a facility used for transferring solid waste from collection vehicles to long-haul vehicles (one transportation unit to another transportation unit)." 30 Tex. Admin. Code § 330.3(157) (Tex. Comm'n on Envtl. Quality, Definitions). The rule

After multiple revisions of and supplements to the initial application, the Commission's Executive Director issued the Registration, along with his responses to public comments, in July 2013. The Commission classified the Facility as a "Type V Transfer Station," and the Registration authorized Pintail to "store and process wastes, and to recycle recovered materials in accordance with the limitations, requirements, and other conditions" set forth in the Registration. Both CALH and the City of Hempstead filed motions to overturn the decision to issue the Registration, which were overruled by operation of law. CALH and the City of Hempstead then filed a suit for judicial review in Travis County District Court. After a hearing, the district court affirmed the Commission's decision to issue the Registration and later denied CALH and the City's joint motion for new trial. CALH and the City then perfected this appeal. In three issues, CALH[2] asserts that (1) the Commission's decision is contrary to the Commission's rules because it authorizes a municipal solid waste facility by registration rather than by permit, (2) by authorizing a municipal solid waste facility by registration, rather than by permit, the Commission deprived CALH and the City of their due process right to a hearing on the authorization, and (3) the Commission should have returned Pintail's application for a registration after it had allowed two technical notices of deficiencies rather than allowing four additional notices of deficiencies and two extensions of time.

---

further provides that a transfer station "is not a storage facility such as one where individual residents can dispose of their wastes in bulk storage containers that are serviced by collection vehicles." *Id.*

[2] Although it filed a notice of appeal, the City did not submit its own appellate brief or join in CALH's.

**DISCUSSION**

CALH's suit for judicial review was authorized by Texas Health and Safety Code section 361.321. Tex. Health & Safety Code § 361.321(a), (e). This section provides that "[a] person affected by a ruling, order, decision, or other act of the commission may appeal the action by filing a petition in the district court of Travis County" and "the issue is whether the action is invalid, arbitrary, or unreasonable." *Id.* This Court has construed the "invalid, arbitrary, or unreasonable" standard of review to incorporate the entire scope of review allowed by the "substantial evidence" standard codified in the Administrative Procedure Act (APA). *See* Tex. Gov't Code § 2001.174; *Smith v. Houston Chem. Servs., Inc.*, 872 S.W.2d 252, 257 n.2 (Tex. App.—Austin 1994, writ denied). This standard requires that we reverse or remand a case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174(2). We apply this analysis without deference to the district court's judgment. *See Texas Dep't of Pub. Safety v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam).

3

In this appeal CALH argues that, by issuing the Registration rather than requiring Pintail to obtain a permit to operate the Facility, the Commission acted in contravention of applicable statutes and agency rules. *See* Tex. Health & Safety Code §§ 361.001-.992 (Solid Waste Disposal Act); 30 Tex. Admin. Code §§ 330.1-.1221 (Tex. Comm'n on Envtl. Quality, Municipal Solid Waste). Resolution of CALH's challenge to the Commission's legal authority to issue the Registration turns principally on the construction of a sourcing statute, chapter 361 of the Texas Health and Safety Code, and the Commission's rules promulgated pursuant to that statute. This presents a question of law that we review de novo. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008).

Our primary objective in construing statutes is to give effect to the Legislature's intent. *Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). The plain meaning of the text is the best expression of legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context, or unless the plain meaning would lead to absurd or nonsensical results that the Legislature could not have intended. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see* Tex. Gov't Code § 311.011 ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."). If there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011). Such deference is particularly appropriate when the statutes and rules at issue concern a matter within the agency's core expertise. *See Employees Ret. Sys. of Tex. v. Garcia*, 454 S.W.3d 121, 133-34 (Tex. App.—Austin 2014, pet. denied). "But this deference to the agency's

4

interpretation is not conclusive or unlimited—we defer only to the extent that the agency's interpretation is reasonable." *Heritage on the San Gabriel Homeowners Ass'n v. Texas Comm'n on Envtl. Quality*, 393 S.W.3d 417, 424 (Tex. App.—Austin 2012, pet. denied). No deference is due when an agency's interpretation fails to follow the clear, unambiguous language of its own regulations. *See Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991). We construe administrative rules in the same manner as statutes, using traditional principles of statutory construction. *TGS-NOPEC Geophysical*, 340 S.W.3d at 438.

We first consider whether the Solid Waste Disposal Act (the Act) and the Commission's rules promulgated pursuant to that statute allowed the Commission to issue the Registration and thereby authorize the Facility by registration rather than by permit. The Act governs the management and control of solid waste materials in this state. *See McDaniel v. Texas Nat. Res. Conservation Comm'n*, 982 S.W.2d 650, 652 (Tex. App.—Austin 1998, pet. denied). The Legislature has charged the Commission with regulating the management of solid waste disposal and has given it broad discretion to adopt rules for authorizing municipal solid waste disposal facilities. *See* Tex. Health & Safety Code §§ 361.002 (establishing purpose of Solid Waste Disposal Act is to safeguard people's health, welfare, and physical property and to protect environment by controlling management of solid waste), .011 (granting powers and duties necessary or convenient to carrying out responsibility to manage solid waste). The Act gives the Commission the authority to administer the statute using different levels of regulation, including both permitting and registration.[3] *McDaniel*,

---

[3] "Registration" is defined as "[t]he act of filing information with the commission for review and approval for specific solid waste management activities that do not require a permit, as determined by this chapter." 30 Tex. Admin. Code § 330.3(125).

982 S.W.2d at 652. The permitting process allows certain individuals to request a contested case hearing, while the registration process does not. *See* 30 Tex. Admin. Code § 312.13(b), (c) (Tex. Comm'n on Envtl. Quality, Actions and Notice).

The Act mandates that the Commission authorize certain types of facilities by permit, *see* Tex. Health & Safety Code §§ 361.002(b) (hazardous waste facilities), .428(b) (mixed municipal solid waste composting operations), and that it is prohibited from requiring a permit for certain other solid waste management activities, *see id.* § 361.090 (prohibiting Commission from requiring permit for collection, handling, storage, processing, and disposal of industrial solid waste under certain specific circumstances). Otherwise, whether to require a permit for a municipal solid waste facility is within the Commission's discretion. *See id.* § 361.061 ("[T]he commission *may* require and issue permits authorizing and governing the construction, operation, and maintenance of the solid waste facilities used to store, process, or dispose of solid waste under this chapter.") (emphasis added); *McDaniel*, 982 S.W.2d at 653 (declining to "give a mandatory meaning to the clearly permissive language of section 361.061").

The Commission's rules related to management of municipal solid waste are found in chapter 330 of Title 30 of the Texas Administrative Code. *See* 30 Tex. Admin. Code §§ 330.1-.1221. Rule 330.7 generally requires a permit for the storage, processing, removal, or disposal of any municipal solid waste. *Id.* § 330.7 (Tex. Comm'n on Envtl. Quality, Permits Required). Exceptions to the general permit requirement are contained in Rule 330.9, which sets forth the municipal solid waste management activities that may be authorized by registration, *id.* § 330.9 (Tex. Comm'n on

6

Envtl. Quality, Registration Required),[4] and in Rule 330.11, which sets forth the municipal solid waste management activities that may be authorized by notification, *id.* § 330.11 (Tex. Comm'n on Envtl. Quality, Notification Required).[5]  Pintail applied for the registration at issue in this case pursuant to Rule 330.9(b)(3) which provides:

> (b) A registration is required for an MSW transfer station facility that is used in the transfer of MSW to a solid waste processing or disposal facility from any of the following:
>
> . . . .
>
> (3) a facility used in the transfer of MSW that transfers or will transfer 125 tons per day or less; . . . .

*Id.* § 330.9(b)(3).

CALH contends that the Commission was not authorized to issue the Registration because the activities it authorizes are in excess of those that can take place at a transfer station and that, as a consequence, those activities did not fall within the scope of Rule 330.9(b)(3). Specifically, CALH argues that the Registration authorizes not simply a "transfer station," but a "transfer station" with a "material recovery operation" and, as a consequence, the Commission was only authorized to issue a registration for that facility if the requirements of Rule 330.9(f) were met.

---

[4] Examples include a waste-separation/recycling facility established at a permitted municipal solid waste facility if owned by the permittee, certain types of transfer facilities, and mobile liquid waste processing units that process only grease trap waste, grit trap waste, septage, or a combination thereof.

[5] Examples include citizens' collection stations, certain collection and processing points for only source-separated recyclable material, and certain facilities used to treat petroleum-contaminated soil.

That rule provides that "a registration is required for any new MSW Type V transfer station that includes a material recovery operation that meets [the 10/50 requirements]."[6] *Id.* § 330.9(f). Pintail did not seek a registration pursuant to Rule 330.9(f) and, consequently, did not represent to the Commission that it met the 10/50 requirements.

On appeal, the parties do not dispute that Pintail did not demonstrate compliance with the 10/50 requirements. Rather, both the Commission and Pintail maintain that the 10/50 requirements have no bearing on the validity of the Registration because the Commission issued the Registration pursuant to Rule 330.9(b)(3) and was authorized to do so. The parties also do not dispute that the Commission authorized Pintail to transfer only 94 tons of municipal solid waste per day and, therefore, the Registration complies with the volume limits required for authorization by registration under Rule 330.9(b)(3). The parties join issue, however, on whether the Commission's rules allowed it to authorize the Facility by registration pursuant to Rule 330.9(b)(3). CALH argues they did not and, furthermore, because authorization by registration pursuant to Rule 330.9(f) was also unavailable due to the failure to meet the 10/50 requirements, Commission rules required that the Facility be authorized by permit.

The question, then, is whether Commission Rule 330.9(b)(3) allowed it to authorize the Facility, by registration, to perform the municipal solid waste management activities identified in the Registration or whether, as CALH argues, a permit was required because the Facility is a "transfer station with a material recovery operation" that did not comply with the 10/50 requirements

---

[6] The 10/50 requirements have to do with the percentage of the incoming waste stream the owner or operator of a transfer station with a material recovery operation must recover (10%) and the proximity of the landfill to which it will transfer the remaining nonrecyclable waste (within 50 miles). *See* 30 Tex. Admin. Code § 330.9(f).

of Rule 330.9(f). We start by looking at the activities the Commission authorized in the Registration and then determine whether those activities are within the scope of those that Commission Rule 330.9(b)(3) allows to be authorized by registration.

The first page of the Registration states that Pintail is "authorized to store and process wastes, and to recycle recovered materials *in accordance with the limitations, requirements, and other conditions set forth herein.*" (Emphasis added.) Those limitations, requirements, and conditions include the following:

**II. Waste Management Units and Operations Allowed**

. . . .

B. Wastes Authorized at this Facility

The registrant is authorized to separate, store, and transfer construction and demolition waste, as defined in 30 TAC Section (§) 330.3(33), from the construction and demolition of residential, community, commercial, institutional, and recreational activities. All waste must be transferred to an authorized disposal facility. The facility is also authorized to recover recyclable materials and transfer the recovered recyclable materials to an authorized facility.

. . . .

D. Waste Acceptance Rate

Solid waste must be accepted for processing at this facility at a rate up to 94 tons per day.

. . . .

9

E. Maximum Volume Available for Storage

The facility may store up to 100 tons of processed and unprocessed materials onsite. The 100 tons includes unprocessed and processed wastes, and all recyclable materials stored inside. The maximum storage limit for unprocessed and processed wastes is 72 hours. Recyclable materials may be stored on site for a maximum of 180 days.

F. Waste Management Units Authorized

The registrant is authorized to operate the facilities related to the separation, storage, and transfer of the wastes authorized, and recycling of the recovered materials, which shall include units, structures, appurtenances, or improvements as described in the registration application.

The waste management units authorized at this facility include: the transfer station building; roll-off boxes, transfer trailers, and other suitable containers; and one 5,000 gallon contaminated water storage tank.

The Commission maintains that all the described solid waste management activities fall within the scope of activities that Rule 330.9(b)(3) allows to be authorized by registration. Specifically, the Commission points out that Rule 330.9(a) allows a registration to authorize "storage, processing, removal, or disposal of any municipal solid waste" if the facility also meets one of the additional registration requirements in subsections (b) through (p). For subsection (b)(3) to authorize registration of a facility used in the transfer of municipal solid waste, the facility may not transfer more than 125 tons of municipal solid waste per day. In the Commission's view, if it meets that volume limitation, then, in accordance with Rule 330.9(a), the facility may conduct "storage, processing, removal, or disposal of" municipal solid waste pursuant to a registration issued by the Commission.

By Commission rule, "storage" is "for a temporary period, at the end of which the solid waste is processed, disposed, or stored elsewhere." 30 Tex. Admin. Code § 330.3(150). The definition of "storage" also states that it includes "post-collection storage by a transporter or processor,

at a processing facility, while the waste is awaiting processing or transfer to another storage, disposal or recovery facility." *Id.* With respect to the "storage" authorized, the Registration provides that "the maximum storage limit for unprocessed and processed waste is 72 hours. Recyclable materials may be stored on site for a maximum of 180 days." Thus, the "storage" allowed by the Registration comports with the Commission's definition of storage that may be authorized by registration under Rule 330.9(a). Rule 330.9(a) also provides that "processing . . . of any municipal solid waste" may be "authorized by registration," and thus the Registration could authorize Pintail to conduct activities constituting "processing" of municipal solid waste. Finally, the Registration authorized Pintail to "recycle recovered materials" in accordance with the limitations and conditions contained in the Registration. Those limitations and conditions are that Pintail may "recover recyclable materials and transfer the recovered recyclable materials to an authorized facility." These activities fall within the Commission's definition of "processing":

> Processing—Activities including, but not limited to, the extraction of materials, transfer, volume reduction, conversion to energy, or other *separation and preparation of solid waste for reuse or disposal*, including the treatment or neutralization of waste, designed to change the physical, chemical, or biological character or composition of any waste to neutralize such waste, or to recover energy or material from the waste, or render the waste safer to transport, store, dispose of, or make it amenable for recovery, amenable for storage, or reduced in volume.

*Id.* § 330.3(117) (emphasis added). Thus the separation and recovery of recyclable materials for reuse falls within the definition of "processing" authorized by registration under Rule 330.9(a).

Despite the fact that the activities the Registration authorizes all fall within the scope of Rule 330.9(a) and that the volume authorized falls within the limits of Rule 330.9(b)(3), CALH argues that authorization by registration was improper because the Facility the Registration

11

authorizes is a "transfer station with material recovery operation."[7]  CALH maintains that the effect

of Rule 330.9(f) is to prohibit authorization by registration of *any* new MSW Type V transfer facility

that has a material recovery facility *unless* the 10/50 requirements are met.  Fatal to this argument,

though, is that subsections (b) through (p) of Rule 330.9 do not identify the types of facilities that

may *not* be authorized by registration, and thus they may not properly be construed as creating

prohibitions on authorization by registration.  Rather, these subsections identify the different types

of municipal solid waste management facilities that *may* be so authorized.  One of those enumerated

facilities is the low-volume transfer station described in 330.9(b)(3).  Another type of facility

that may be authorized by registration is described in 330.9(f), that is, any new MSW Type V

transfer facility with a material recovery operation *if* the 10/50 requirements are met.  If the 10/50

requirements are not met, then authorization by registration must be pursuant to a different

subsection of 330.9, in this case (b)(3).  Put differently, a transfer station can be authorized by

registration if it *either* (1) transfers 125 tons per day or less, *or* (2) also includes a material recovery

operation that meets the 10/50 requirements.[8]  Any other type of transfer station may not be

authorized by registration.  The Commission did not fail to follow the clear, unambiguous language

of its regulations in issuing the Registration.

---

[7]  The Commission's rules include the following definition:

> Waste-separation/recycling facility—A facility, sometimes referred to as a material
> recovery facility, in which recyclable materials are removed from the waste stream
> for transport off-site for reuse, recycling, or other beneficial use.

30 Tex. Admin. Code § 330.3(174).

[8]  Rule 330.9 also allows authorization by registration of a transfer facility located within the permitted boundaries of an MSW Type I or Type IV facility.  30 Tex. Admin. Code § 330.9(b)(4).

We are unpersuaded by CALH's argument that, because the Registration authorizes some material separation and recovery at the facility, it was issued in contravention of Rule 330.9(b)(3). Nothing in that rule provides that material separation activities may not occur at a low-volume transfer station authorized by registration. To the extent that Rule 330.9(f)'s separate authorization by registration of a transfer station with certain qualifying material recovery operations creates any ambiguity as to whether Rule 330.9(b)(3) can apply to a low-volume transfer station where any type of material separation activities occur, we defer to the Commission's policy determinations and reasonable interpretation of the rule it has promulgated pursuant to the broad discretion granted to it by the Legislature to control all aspects of the management of municipal solid waste, a technical area within the core expertise of the Commission. *See TGS-NOPEC Geophysical*, 340 S.W.3d at 438; *Employees Ret. Sys. of Tex.*, 454 S.W.3d at 133-34. The Commission's interpretation of Rule 330.9(b)(3) to encompass a low-volume transfer station that engages in the separation of recyclable materials from the construction and demolition waste stream is consistent with the Commission's determination that certain "storage," "processing," or "removal" of municipal solid waste may be authorized by registration when the facility has certain other qualifying characteristics. *See* 30 Tex. Admin. Code § 330.9(a) (authorizing by registration certain storage, processing, removal, and disposal activities). Here, that qualifying characteristic is that the Facility transfers a low volume of municipal solid waste. We overrule CALH's first issue.

In its second issue, CALH contends that, because it had a statutory right to a contested-case hearing, the Commission's failure to hold a hearing constituted the denial of its procedural due-process rights. As CALH acknowledges, its right to a contested-case hearing arises when the Commission considers an application for a municipal solid waste permit, but not when it

13

decides whether to issue a registration. Thus, the correctness of CALH's claim to have been entitled to a contested-case hearing depends on, and is derivative of, a conclusion that the Facility could not have been authorized by a registration and instead was required to go through the permitting process. As set forth above, we have concluded that the Commission rules allowed the Commission to authorize the Facility by registration and no permit was required. It follows that CALH was not entitled to a contested-case hearing with respect to authorization of the Facility, and its due process rights were not violated by the Commission's failure to hold such a hearing. Moreover, the record reflects that CALH participated actively in the registration process, including providing public comments and filing a motion to overturn the decision to issue the Registration. CALH does not contend that it was denied the opportunity to participate in the registration process to the full extent required by the applicable Commission rules. We overrule CALH's second issue.

In its third issue, CALH states that the Commission's decision to issue the Registration should be reversed because the Commission issued more than two notices of deficiencies (NODs) in connection with its consideration of Pintail's application and thereby failed to comply with its "stated policy to allow no more than two (2) NODs before returning an MSW registration application." CALH maintains that the Commission's "policy" derives from (1) a warning to Pintail from a member of the Commission staff reviewing the application that a "third notice of deficiency will not be issued," (2) a statement made by the Commission in its Sunset Evaluation Report that it returns registration requests if an applicant does not successfully resolve the second NOD, and (3) the following "consistent" Commission instruction to its staff, applicable to all registrants:

Review the second NOD response. If the application still has significant deficiencies, prepare a letter for the **Section Manager's** signature returning the application with an explanation why the application is being returned. If the deficiencies are very minor in nature, work with the applicant to resolve them. There are no third NODs.

Citing no authority, CALH asserts that the Commission "should be bound to follow its public pronouncements," and, if the Commission fails to do so, "the public will lose trust in their state environmental regulators." While that may be true as a public relations matter, CALH does not explain how the Commission's action here, even if apparently in contravention of its prior statements regarding how many NODs it will issue before returning an application, constitutes a legal ground for reversing its decision under the governing standard of review.

CALH essentially argues that the Commission's "policy" dictates a specific result—the return of Pintail's application when deficiencies remained after two NODs had been issued—without regard to the individual circumstances. If that is the case, then the alleged "policy" is actually operating as an agency "rule," i.e., an agency statement that has a binding effect on private parties. *See Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 546 (Tex. App.—Austin 2011, pet. denied). A rule that is not properly promulgated under mandatory APA procedures is invalid, *see El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709, 714 (Tex. 2008), and an agency decision based on an invalid rule must be reversed and remanded to the agency if substantial rights of the appellant have been prejudiced thereby, *see* Tex. Gov't Code § 2001.174(2) (specifying when trial court must reverse and remand agency decision). Thus, had the Commission returned Pintail's application for a registration after two NODs based on a "policy" (rule) requiring it to do so regardless of the individual circumstances presented, and not promulgated

15

under mandatory APA procedures, as CALH argues it should have, it would have reversibly erred by basing its decision on an invalid rule. Absent such a rule, the Commission had discretion to issue more than two NODs and exercised such discretion in this case. We overrule CALH's third issue.

## CONCLUSION

Having overruled CALH's three appellate issues, we affirm the trial court's judgment affirming the Commission's decision to issue Municipal Solid Waste Registration No. 40259 to Pintail Landfill, L.L.C.

_____

Scott K. Field, Justice

Before Chief Justice Rose, Justices Goodwin and Field

Affirmed

Filed:   April 13, 2016

16