# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00169-CV

**Texas Architectural Aggregate, Inc., Appellant**

**v.**

**Texas Commission on Environmental Quality, Appellee**

### FROM THE 200TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-001356, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Raising six issues, Texas Architectural Aggregate, Inc. (TAA) appeals from the trial court's final judgment, which affirmed the Texas Commission on Environmental Quality's (TCEQ) order assessing an administrative penalty of $4,500 against TAA and requiring corrective action concerning TAA's mining operations at a site that TAA was leasing. For the following reasons, we affirm the trial court's judgment.

## BACKGROUND

**Texas Pollutant Discharge Elimination System Program**

TCEQ is the administrator of the Texas Pollutant Discharge Elimination System (TPDES) program, which implements the National Pollution Discharge Elimination System (NPDES) program. *See* Tex. Water Code §§ 26.017(5) (authorizing TCEQ to obtain or administer "NPDES program in lieu of the government of the United States"), .027(a)

(authorizing TCEQ to issue permits for discharge of waste or pollutants into or adjacent to water in state)[1]; *see also id.* § 26.001(23) (defining NPDES); 33 U.S.C. § 1342(a) (addressing permits for discharge of pollutants under NPDES); 63 Fed. Reg. 51164-01 (1998) (approving TPDES program under Clean Water Act).

Under the TPDES program, TCEQ is authorized to issue general permits in lieu of individual permits for "the discharge of waste to or adjacent to waters in the state by category of dischargers . . . if the dischargers in the category discharge storm water." *See* Tex. Water Code § 26.040(a); *see also id.* § 26.001(6) (defining "waste"), (20) (defining "[t]o discharge"). "'Water' or 'water in the state'" includes groundwater, rivers, streams, creeks, and "all other bodies of surface water, natural or artificial, inland or coastal, fresh or salt, navigable or nonnavigable, and including the beds and banks of all watercourses and bodies of surface water, that are wholly or partially inside or bordering the state or inside the jurisdiction of the state." *Id.* § 26.001(5).

TCEQ also has adopted rules related to the TPDES program, including adopting by reference Section 122.26 of Title 40 of the Code of Federal Regulations. *See* 30 Tex. Admin. Code § 281.25(a)(4) (Tex. Comm'n on Env't Quality, Additional Facilities and Projects for Which Texas Pollutant Discharge Elimination System (TPDES) Permits Are Required); 40 C.F.R. 122.26 (addressing state NPDES permitting requirements for storm water discharges). Pursuant to this adopted rule, "for storm water discharges associated with industrial activity," an

---

[1] The Texas Water Code defines the "Commission" to mean the Texas Natural Resource Conservation Commission (TNRCC). Tex. Water Code § 26.001(2) (defining "Commission"). In 2001, the TNRCC was renamed the Texas Commission on Environmental Quality (TCEQ). *Tara Partners, Ltd. v. City of South Houston*, 282 S.W.3d 564, 574 n.12 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

applicant under the TPDES program is "required to apply for an individual permit or seek coverage under a promulgated storm water general permit." *See* 40 C.F.R. § 122.26(c).

In July 2011, TCEQ issued TPDES General Permit No. TXR050000 for "[f]acilities that discharge storm water associated with industrial activity," commonly referred to as the Multi-Sector General Permit (MSGP), and in July 2016, TCEQ issued a revised MSGP. Facilities seeking coverage under the MSGP must submit a notice of intent for permit coverage or they may submit a "no exposure" certification to claim an exemption from the general requirement to obtain a permit for stormwater discharges associated with industrial activity. *See id.* § 122.26(g). The MSGP includes provisions that apply to storm water discharges associated with "industrial activity" from "active and inactive non-metallic mineral mining facilities," including facilities mining crushed and broken stone.

**TCEQ's Investigation of TAA's Site and Ensuing Enforcement Action[2]**

Beginning in the mid-1970s, TAA leased property for a quarry that contained blue dolomite, known as the "Blue Pit," for mining operations. This site is in the Llano River Basin, which feeds into the Colorado River, and is adjacent to and intersected by Byrnes Creek. The water in the Blue Pit is mostly groundwater that seeps into the pit, but runoff, which contains waterborne solid substances, from TAA's work area drains back into the pit, and runoff from the site flows naturally into Byrnes Creek. Dust, solid matter, and water effluents are released when stone is quarried, processed, and transported, and TAA did not undertake activity at the site to control or suppress dust produced by its mining or extracting activities. TAA also pumped water from the Blue Pit to Byrnes Creek to make the pit accessible for its mining activities. Before

---

[2] The background facts concerning TAA's mining operations primarily are taken from TCEQ's findings of fact.

October 1, 2014, it used the site intermittently "to match installed terrazzo floors," but after October 1, 2014, TAA was not engaging in active excavation or mining operations within the Blue Pit, was not mining or extracting from the site, and was not emptying water from the pit. TAA also removed equipment from the site.

In August 2015, a TCEQ investigator conducted an aggregate production operation (APO) on-site survey and storm water reconnaissance investigation of TAA's site. *See* Tex. Water Code § 28A.052 (requiring TCEQ to annually conduct physical survey of state to identify all active APOs and to ensure that each active APO is registered with state); *see also id.* § 28A.001(2) (defining "aggregate" to include crushed and broken stones). The investigator observed stockpiles of aggregate materials that had been mined from the site, a small excavator, a pump with a hose that extended from the Blue Pit to Byrnes Creek, and a haul truck. The investigator observed no active dewatering of the pit or a discharge route from the pit, but he spoke with a TAA employee, who was operating a front-end loader, and the employee told the investigator that TAA pumped water from the Blue Pit to Byrnes Creek for its excavation operations.

Following this investigation, TCEQ's executive director initiated an enforcement action against TAA. *See id.* §§ 7.002 (authorizing TCEQ to initiate action to enforce provisions of Texas Water Code), .054 (authorizing executive director to issue report of violation). The executive director alleged that TAA had violated Section 26.121 of the Texas Water Code, Subsection 281.25(a)(4) of Title 30 of the Texas Administrative Code, and Subsection 122.26(c) of Title 40 of the Code of Federal Regulations by failing to obtain authorization under the MSGP

to discharge stormwater associated with industrial activities.[3]  TAA did not have a permit to discharge waste from the site into or adjacent to water in the state, had not obtained authorization under the MSGP for discharges from the site, and did not have a storm water pollution plan.  The MSGP identifies sediment as a pollutant of concern.

TAA filed an answer denying the allegations and requested a contested-case hearing, which occurred before an administrative law judge (ALJ) in April 2017.  The witnesses were the investigator, a TCEQ enforcement coordinator, TAA's representative, and TAA's attorney, and the exhibits included copies of the investigation report, photographs of the site, correspondence between the parties, discovery responses, copies of the applicable statutes and rules, TPDES General Permit No. TXR050000, and the Environmental Protection Agency's guidance on the non-metal mining industry, which notes that waste generated from mineral processes includes "dust, solid matter, and water effluents" and that these substances are released when stone is quarried, processed, and transported.

The investigator testified about his observations of the site during his on-site survey and investigation in August 2015, his communications with TAA's employee who was present at the site, and his subsequent communications with TAA's representatives.  He also testified about the types of pollutants associated with this type of site, including identifying "sediment or suspended material," and based on his observations, his belief that activities related to excavation were being conducted at the site.  He further testified that areas of TAA's site in addition to the pumping from the pit were "considered a source of pollutant, including the

---

[3]  The executive director also alleged that TAA had failed to register the site as an aggregate production operation (APO).  *See* 30 Tex. Admin. Code § 342.25(b) (Tex. Comm'n on Env't Quality, Registration) (requiring responsible party for APO to register operation with TCEQ).  This allegation was resolved, and the executive director filed an amended petition before the contested-case hearing that did not include this allegation.

5

stockpiles and the equipment and storage areas" and the "haulage roads, access roads." TCEQ's enforcement coordinator testified about the penalty calculation in this case. The parties stipulated that the penalty calculation complied with TCEQ's penalty policy.

TAA's witnesses testified that TAA was no longer mining the property, that the property "had been dormant for over six months" when the inspection occurred in 2015, and that TAA had decided to close its operations at the site. TAA's representative testified that the property's tenant uses water from the pit for watering cattle and that the hoses belong to the tenant, that certain equipment was not operational and no longer on the site, and that the haul truck was no longer there. He also testified that the property had been returned to post-mining use and that they had not done "any mining out there in some time." TAA's attorney testified about recent photographs of the site, which were admitted into the record, the groundwater cycle on the property, and the current use of the site. The attorney testified that the Blue Pit was being used for agricultural purposes and that the "whole place is not commercially viable" for mining in the Blue Pit.

The evidence supported that TAA had removed equipment and was not actively engaging in mining operations at the site but that it had in the past, that an excavator remained on site at the time of the hearing, and that prior to the 2015 on-site investigation, TAA had pumped water from the pit to the creek for its mining operations. For example, in an email from TAA to the TCEQ investigator shortly after the inspection, TAA's representative confirmed that its operations pumped water from the Blue Pit: "[T]he operations are contained within that pit. The water which is found in this pit is mostly groundwater that began to seep into the pit many years ago. Our pumping of the water is to access the mineral we are seeking." TAA's representative

6

also stated in the same email that "under current market conditions, within any given year, we would remove less than 150 tons of dolomite, if any."

In the proposal for decision (PFD), the ALJ found that TAA violated Subsection 26.121(a)(1) of the Texas Water Code but that it had not violated Subsection 281.25(a)(4) of Title 30 of the Texas Administrative Code or Subsection 122.26(c) of Title 40 of the Code of Federal Regulations. The ALJ recommended a penalty of $1,125 based on one day of violation and the corrective action suggested by the executive director. The executive director filed exceptions to the PFD, and TAA filed exceptions and a motion to reopen the record concerning an attached document titled "Release of Mineral Lease & Associated Surface Lease." The document was signed in September 2017 and purports to release all TAA's interests in the site effective April 2017. TAA represented that it no longer held the lease or any interest in the site.

On December 13, 2017, TCEQ considered the matter at a meeting, and on December 22, 2017, it issued its final order. TCEQ found that TAA violated Subsection 26.121(a)(1) of the Texas Water Code, Subsection 281.25(a)(4) of Title 30 of the Texas Administrative Code, and Subsection 122.26(c) of Title 40 of the Code of Federal Regulations; that the violations continued for more than one day; assessed a penalty of $4,500; and ordered alternative corrective action. *See* Tex. Water Code § 7.073 (authorizing TCEQ to assess administrative penalty and order person to take corrective action). TAA was required to either: (i) remove equipment, stabilize the site, and return it to a post-mining use consistent with the MSGP or (ii) develop and implement a stormwater pollution prevention plan and submit a notice of intent requesting coverage under the MSGP.

TAA filed a motion for rehearing, which was overruled by operation of law on February 15, 2018, and a suit for judicial review of TCEQ's final order. In October 2021, the

7

trial court held a hearing on the merits. Following the hearing, the trial court affirmed TCEQ's final order. This appeal followed.

## ANALYSIS

In six issues, TAA contends that: (i) "TCEQ lacked jurisdiction to discipline TAA"; (ii) TCEQ's finding of a violation of Subsection 26.121(a)(2) of the Texas Water Code "was not supported by the law or substantial evidence"; (iii) TCEQ "abandoned its claims under 30 [Tex. Admin. Code] § 281.25(a)(4) and 40 C.F.R. § 122.26"; (iv) TCEQ "applied an overbroad interpretation of 'storm water discharge' in this case"; (v) TCEQ "lacked the authority to change the ALJ's findings of fact regarding no violation of 40 C.F.R. § 122.26(c) and 30 [Tex. Admin. Code] § 281.25(a)(4)"; and (vi) "TCEQ's order is arbitrary and capricious because it fails to include the owner of the property at issue" and "orders remedial action" against TAA, who is "a former lessee that ceased to have any legal interest in the property before TCEQ initiated its enforcement action."

### Standard of Review

We review TCEQ's orders under the substantial evidence rule to determine whether TAA's substantial rights "have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are "in violation of a constitutional or statutory provision"; "in excess of the agency's statutory authority"; "made through unlawful procedure"; "affected by other error of law"; "not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole"; or "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Tex. Gov't Code § 2001.174(2)(A)–(F); see Tex. Water Code § 7.064. Our inquiry into whether an agency's

8

decision meets this standard considers whether the evidence supports the agency's determination, asking "not whether the agency's decision is correct, but whether the record demonstrates a reasonable basis for the decision." *Texas Comm'n on Env't Quality v. Maverick County*, 642 S.W.3d 537, 547 (Tex. 2022) (citing *Northeast Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 251 (Tex. 2020)). The contestant bears the burden to overcome the presumption that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence. *Id.* (citing *Texas Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 453 (Tex. 1984)).

TAA's issues also require us to construe statutes and agency regulations, questions of law which we review de novo. *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011) (stating that "construction of a statute is a question of law we review de novo"); *Maverick County*, 642 S.W.3d at 544 ("Courts interpret agency regulations 'using the same principles we apply when construing statutes'" (quoting *Patients Med. Ctr. v. Facility Ins.*, 623 S.W.3d 336, 341 (Tex. 2021))). We begin with the text's "plain and common meaning." *El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 418 (Tex. 2017) (citing *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865–66 (Tex. 1999)); *see also Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010) (explaining that courts construe statutory "text according to plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results" (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008))). "In conducting this analysis, 'we look at the entire act, and not a single section in isolation.'" *Murphy*, 518 S.W.3d at 418. This "text-based approach to statutory construction requires us to study the language of the specific provision at issue, within the context of the statute as a whole,

9

endeavoring to give effect to every word, clause, and sentence." *Id.* (quoting *Ritchie v. Rupe*, 443 S.W.3d 856, 867 (Tex. 2014)).

We "generally uphold an agency's interpretation of a statute it is charged by the Legislature with enforcing, 'so long as the construction is reasonable and does not contradict the plain language of the statute.'" *Texas Citizens*, 336 S.W.3d at 625 (quoting *First Am. Title Ins. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008)). But "[w]hen the statute's language 'is unambiguous and does not lead to absurd results, our search . . . ends there.'" *Murphy*, 518 S.W.3d at 418 (quoting *Texas Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 362 (Tex. 2013)).

**TCEQ's Jurisdiction**

In its first issue, TAA contends that TCEQ lacks jurisdiction to discipline it because the "Texas Legislature amended Chapter 28A of the Texas Water Code to exempt small terrazzo type 'aggregate production operations' (APOs), effective May 26, 2017." *See* Act of May 12, 2017, 85th Leg., R.S., ch. 167, § 1, 2017 Tex. Gen. Laws 311, 311 (codified at Tex. Water Code § 28A.001(1)(E)). Chapter 28A addresses certain APOs, generally defining an APO as "the site from which aggregates are being or have been removed or extracted from the earth, including the entire areas of extraction, stripped areas, haulage ramps, and the land on which the plant processing the raw materials is located." Tex. Water Code § 28A.001(1). "For the purposes of [Chapter 28A]," the definition of an APO was amended in 2017 to exclude a site that "does not exceed five acres" and at which the materials being removed or extracted are "specialty or terrazzo-type stone" that is "exclusively for decorative or artistic uses." *Id.* § 28A.001(1)(E). Relying on this amendment, TAA contends that it is no longer subject to

10

Chapter 28A and characterizes itself as "an unregulated entity that need not obtain a discharge permit."

As part of its second issue, TAA also argues that Chapter 26, particularly Subsection 26.121(a)(1), "does not override Chapter 28A." Chapter 26 generally concerns water quality and TCEQ's role in regulating water quality. TCEQ is the "principal authority in the state on matters relating to the quality of the water in the state," *id.* § 26.127(a), and is authorized to administer Chapter 26's provisions, establish water quality standards, and adopt rules concerning "[w]aste discharges" and "impending waste discharges," *id.* § 26.011. "Except as authorized by [TCEQ], no person may . . . discharge . . . industrial waste into or adjacent to any water in the state." *Id.* § 26.121(a)(1). "'Industrial waste' means waterborne liquid, gaseous, or solid substances that result from any process of industry, manufacturing, trade, or business." *Id.* § 26.001(11); *see also id.* § 26.001(5) (defining "water in the state").

TAA argues that TCEQ lost jurisdiction to pursue its enforcement action against TAA because: (i) the executive director's enforcement case "was merely 'pending' when the law changed," (ii) the amendment to Chapter 28A did not contain a savings clause to preserve pending enforcement cases, and (iii) TCEQ's order was not "'final' under the [Administrative Procedures Act (APA)]" until February 20, 2018, which was after the amendment to Chapter 28A was effective. As support, TAA cites cases that conclude that a court loses subject matter jurisdiction over a cause of action in a pending suit when the cause of action is based on a statute that is repealed without a savings clause. *See, e.g.*, *Quick v. City of Austin*, 7 S.W.3d 109, 125 (Tex. 1998) (stating that cause of action based on statute that is repealed without savings clause "is usually given immediate effect" and that "repeal of the statute in such instances deprives a

court of subject matter jurisdiction over the cause" (citing *Knight v. International Harvester Credit Corp.*, 627 S.W.2d 382, 384 (Tex.1982))).

TAA also relies on other provisions in Chapter 28A to argue that TCEQ lacked regulatory authority over it when it entered its final order because, according to TAA, TCEQ did not prove that TAA is an "active" APO or a "responsible party." *See* Tex. Water Code §§ 28A.001(1) (defining APO for purposes of chapter); (6) (defining "responsible party" for purposes of chapter), .052 (requiring TCEQ to conduct physical survey of state to identify "active" APOs and ensure that "active" APOs are registered).[4]

TCEQ, however, removed its allegation that TAA had violated its rule requiring APO registration prior to the contested-case hearing, and it does not follow that exempting an operation from the registration requirement in Chapter 28A would also exempt that operation from other statutory requirements or impact TCEQ's authority under other chapters of the Texas Water Code, specifically Chapter 26. *See id.* §§ 26.011–.053 (addressing TCEQ's general powers and duties); *see also id.* §§ 7.051(a)(1) (authorizing TCEQ to assess administrative penalty against "person" who violates provision of code or rule adopted by TCEQ under statute within TCEQ's jurisdiction), .073 (authorizing TCEQ to assess administrative penalty and order corrective action when "person violates any statute or rule within [TCEQ]'s jurisdiction").

Chapter 26 generally requires TCEQ to administer its provisions and grants it "the powers and duties specifically prescribed by this chapter and all other powers necessary or convenient to carry out its responsibilities." *See id.* § 26.011. Among its powers, TCEQ employees and agents may enter private property "for the purpose of inspecting and investigating

---

[4] For registered APOs, TCEQ also must inspect them periodically after providing notice "for compliance with applicable environmental laws and rules under the jurisdiction of [TCEQ]." Tex. Water Code § 28A.053(a), (b).

12

conditions relating to the quality of water in the state or the compliance with any rule, regulation, permit or other order of [TCEQ]." *See id.* § 26.014. Further, without TCEQ's authorization, a "person" is prohibited from discharging "industrial waste" into or adjacent to water in the state. *See id.* § 26.121(a)(1). And the Legislature granted TCEQ power to enforce the Texas Water Code, including Chapter 26. *See id.* §§ 7.051(a)(1), .073. Had the Legislature intended to exclude APOs that were exempt from the registration requirements under Chapter 28A from TCEQ's regulatory authority under Chapter 26, it presumably would have expressly stated so. *Cf. id.* §§ 7.051(b) (expressly stating that subchapter does not apply to violations of listed chapters of code), 26.011 (expressly stating that Chapter 26 "does not apply to discharges of oil covered under Chapter 40, Natural Resources Code"), 28A.001(defining terms "[i]n this chapter").

Applying the plain meaning of the relevant statutory provisions, we conclude that TCEQ had jurisdiction over the executive director's enforcement case against TAA that was based on Chapter 26 and related rules. *See Murphy*, 518 S.W.3d at 418. Thus, we overrule TAA's first issue and its second issue to the extent it challenges TCEQ's jurisdiction.

**Texas Water Code § 26.121(a)(1)**

In the remainder of its second issue, TAA argues that TCEQ's finding of a violation of Subsection 26.121(a)(1) of the Texas Water Code was not supported by the law or substantial evidence. TAA argues that there was no evidence of water pollution or an "actual discharge" of waste, including industrial waste. *See* Tex. Water Code § 26.121(a)(1) (except as authorized by TCEQ, prohibiting person from discharging waste, including industrial waste, into or adjacent to water in state). "'Industrial waste' means waterborne liquid, gaseous, or solid

13

substances that result from any process of industry, manufacturing, trade, or business." *Id.* § 26.001(11). And "'[t]o discharge' includes to deposit, conduct, drain, emit, throw, run, allow to seep, or otherwise release or dispose of, or to allow, permit, or suffer any of these acts or omissions." *Id.* § 26.001(20).

TCEQ's conclusions of law concerning the statutory violation included that "[t]he preponderant evidence shows that [TAA] violated Tex. Water Code § 26.121(a)(1)" and

> 11. The groundwater in the Blue Pit was and is water in the state. Tex. Water Code § 26.001(5).
>
> 12. Because [TAA] is a business, the waterborne solid substances from its process in the runoff from its work area at the Site to the Blue Pit were waste and industrial waste. Tex. Water Code § 26.001(6), (11).
>
> 13. By allowing runoff containing waterborne solid substances to drain from its work area at the Site to the Blue Pit, [TAA] discharged waste into water in the state. Tex. Water Code § 26.001(20). . . .
>
> 14. By allowing runoff containing waterborne solid substances to drain from Site storage areas to Byrnes Creek, including via the Site's access road, [TAA] discharged waste into water in the state. Tex. Water Code § 26.001(20). . . .
>
> 15. By pumping water containing solid substances from the Blue Pit to Byrnes Creek, [TAA] discharged waste into water in the state. Tex. Water Code § 26.001(20).

TAA argues that the Legislature's exemption of APOs from regulation in Chapter 28A "removed the processes of such APOs from being industrial waste," and TAA compares the statutory definitions of industrial waste and agricultural waste to argue that a "discharge" under Subsection 26.121(a)(1) "does not include run-off from storm events." But because runoff from certain types of agricultural operations is not considered "agricultural waste," its definition necessarily included a distinction. *See id.* § 26.001(10) (distinguishing between rainwater runoff from different types of agricultural operations that fall within meaning of agricultural waste). In

14

contrast, the statutorily defined terms "industrial waste" and "to discharge" do not include a distinction between rainwater runoff from different types of industrial activity. *See id.* § 26.001(11), (20). The plain meaning of these terms makes clear that industrial waste includes stormwater runoff because "to discharge" includes "to allow, permit, or suffer any of these acts or omissions." *See id.* § 26.001(20); *see also id.* § 26.001(13) (defining "pollutant" to include agricultural and industrial waste "discharged into any water in the state" but expressly excluding rainwater runoff from certain types of agricultural operations).

TAA also relies on TCEQ's finding of fact that "the investigator observed no active dewatering of the [Blue] Pit or a discharge route from the Pit" and the evidence that the creek was dry, but the fact that the creek was dry at times or that the investigator did not observe an actual discharge is not dispositive here. First, the statutory definition of water in the state includes the beds of all watercourses, *see id.* § 26.001(5), and the investigator testified that he observed stockpiles of mined rocks, excavation equipment, and a pump with a hose that extended from the pit to the creek. He also testified that TAA's employee on site told him that TAA pumped water from the pit to the creek for excavation operations, and the evidence included TAA's representative's statement in correspondence with TCEQ that the Blue Pit was "mostly groundwater that began to seep into the pit many years ago" and that "[o]ur pumping of the water is to access the minerals we are seeking." There also was evidence that there was a haul truck, other equipment, storage and work areas, and an access road on site.

TCEQ's findings of fact included that:

- Byrnes Creek is in the Llano River Basin, which feeds into the Colorado River;

15

- "[d]ust, solid matter, and water effluents are released when stone is quarried, processed, and transported";

- TAA "has not undertaken any activity at the Site to control or suppress any dust produced by mining or extraction activities";

- "[s]ediment is also a pollutant of concern";

- runoff from TAA's "work area to the Blue Pit contains waterborne solid substances";

- TAA's "work area drains back into the Blue Pit";

- the Blue Pit "was mostly groundwater that seeped into the pit";

- "[r]unoff would contribute nine inches of water to the Blue Pit in an average year with 30 inches of rainfall"; and

- TAA "has no Commission permit to discharge waste from the Site into or adjacent to water in the state."

These findings, which are supported by the record, provide the factual basis for TCEQ's conclusion of law that TAA violated Subsection 26.121(a)(1). *See* Tex. Water Code § 26.121(a)(1); *see also* Tex. Gov't Code § 2001.174(2); *Hyundai Motor Am. v. New World Car Nissan, Inc.*, 581 S.W.3d 831, 838 (Tex. App.—Austin 2019, no pet.) (explaining that conclusions of law are findings of ultimate facts and that they must be reasonably supported by findings of basic facts); *Employees Ret. Sys. of Tex. v. Garcia*, 454 S.W.3d 121, 132 (Tex. App.—Austin 2014, pet. denied) (stating that agency's findings of basic or underlying facts must be supported by substantial evidence).

For these reasons, we conclude that TAA has not overcome the presumption that TCEQ's findings, inferences, and conclusions as to the Texas Water Code violation are supported by substantial evidence and overrule the remainder of TAA's second issue. *See Maverick County*, 642 S.W.3d at 547 (stating that it is contestant's burden to overcome presumption that agency's findings, inferences, and conclusions are supported by substantial

16

evidence); *Heritage on San Gabriel Homeowners Ass'n v. Texas Comm'n on Env't Quality*, 393 S.W.3d 417, 436 n.11 (Tex. App.—Austin 2012, pet. denied) ("We may not set aside an agency decision merely because testimony was conflicting or disputed or because it did not compel the agency's decision." (citing *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1984))).

**30 Tex. Admin. Code § 281.25(a)(4) and 40 C.F.R. § 122.26(c)**

In its third and fourth issues, TAA challenges TCEQ's findings that TAA violated Subsection 281.25(a)(4) of Title 30 of the Texas Administrative Code and Subsection 122.26(c) of Title 40 of the Code of Federal Regulations. TCEQ's findings of fact included that TAA did not have a permit, had not submitted a notice of intent or "obtained authorizations under the MSGP for any discharges from the Site," and had failed to obtain authorization under the MSGP "to discharge storm water associated with industrial activities." In its conclusions of law numbers 13 and 14, TCEQ found that by allowing the runoff containing waterborne solid substances to drain from the work area to the Blue Pit and from site storage areas to Byrnes Creek, TAA "also discharged storm water without authorization," citing the TCEQ rule and adopted federal regulation.

*Abandonment of Allegations*

In its third issue, TAA argues that TCEQ "abandoned its claims under 30 [Tex. Admin. Code] § 281.25(a)(4) and 40 C.F.R. § 122.26" and, therefore, its conclusions that TAA violated those provisions "are not supported by the complaint and are in error." According to TAA, "[r]egistration was the means by which TAA would have obtained authority for any discharges" under the TCEQ rule and adopted federal regulation and because TCEQ dropped its

17

allegation of failure to register, it also abandoned its claims under the TCEQ rule and adopted federal regulation.

The administrative record, however, reflects that TCEQ did not abandon these claims. The executive director's first amended report and petition, the live pleading at the time of the contested-case hearing, alleged the following:

> During an investigation conducted on August 10, 2015, an investigator documented that [TAA] failed to obtain authorization to discharge storm water associated with industrial activities under Texas Pollutant Discharge Elimination System ("TPDES") General Permit ("GP") No. TXR050000, in violation of Tex. Water Code § 26.121, 40 C.F.R. § 122.26(c), and 30 Tex. Admin. Code § 281.25(a)(4).

The executive director also presented evidence and arguments during the contested-case hearing to support these allegations. Based on our review of the administrative record, we conclude that TCEQ did not abandon these claims and overrule TAA's third issue.

*Storm Water Discharge*

In its fourth issue, TAA challenges TCEQ's findings that TAA violated the TCEQ rule and the adopted federal regulation on the ground that TCEQ applied "an overbroad interpretation of 'storm water discharge' in this case," specifically that it "simply applied the wrong legal standard, or misapplied the correct legal standard, by failing to show a discharge from a point source." TAA argues that TCEQ's order does not contain findings of "a point source discharge under section 122.26(b)(14)" of the federal regulation to support its conclusions that TAA discharged stormwater in violation of TCEQ's rule and the federal regulation. TAA's argument focuses on the federal regulation's definition of "discharge." *See* 40 C.F.R. § 122.2 (defining "discharge when used without qualification" to mean "'discharge of a pollutant'" and

18

defining "discharge of a pollutant" to include "addition of any 'pollutant' or combination of 'pollutant' to 'waters of the United States' from any 'point source'"); *see also* 33 U.S.C. §§ 1311(a) (prohibiting discharges of any pollutant without authorization), 1362(12) (defining "discharge of a pollutant" as "addition of any pollutant to navigable waters from any point source"). Under federal law, a "point source" is "any discernable, confined, and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see also* Tex. Water Code § 26.001(21) (similarly defining "point source").

TCEQ's rule, adopting the federal regulation, requires a facility to obtain coverage under the MSGP for "[s]torm water discharges associated with industrial activity," and industrial activity is defined to include "active or inactive mining operations." *See* 40 C.F.R. § 122.26(a)(ii), (b)(14)(iii).[5] "For certain categories of industries identified in this section," including mining operations, storm water discharge associated with industrial activity is defined to include "storm water discharges from industrial plant yards," "immediate access roads," "material handling sites," "sites used for the storage and maintenance of material handling equipment," "shipping and receiving area," "storage areas . . . for raw materials," and "areas where industrial activity has taken place in the past and significant materials remain and are exposed to storm water." *Id.* § 122.26(b)(14); *see also* 33 U.S.C. § 1342(p)(2)(B). Thus, applying the plain language of this provision in context, we conclude that the term "discharge" in the adopted federal regulation is not "used without qualification" such that it would only cover

---

[5] "[I]nactive mining operations are mining sites that are not being actively mined, but which have an identifiable owner/operator." 40 C.F.R. § 122.26(b)(14)(iii).

19

storm water discharge from a "point source."[6]  *Cf.* 40 C.F.R. § 122.2 (defining "discharge when used without qualification").

To the extent that TAA argues that TCEQ was attempting to enforce federal law without legislative authorization, TAA's argument overlooks that TCEQ was not attempting to enforce federal law but to enforce TCEQ's rule that adopted the federal regulation in its entirety. *See* 30 Tex. Admin. Code § 281.25(a)(4) (adopting by reference 40 C.F.R. § 122.26 "requiring permits for storm water discharges").  In other words, a violation of the federal regulation was a violation of TCEQ's rule.  TCEQ did not assess an additional penalty for TAA's violation of the federal regulation but found a single violation.  And TCEQ has statutory authority to adopt rules concerning "[w]aste discharges or impending waste discharges," Tex. Water Code § 26.011; to initiate an enforcement action for the violation of its rules, *see id.* § 7.002; and to assess administrative penalties for the violation of its rules, *see id.* § 7.051(a)(1)(B); *see also id.* § 26.011 ("The [TCEQ] has the powers and duties specifically prescribed by this chapter and all other powers necessary or convenient to carry out its responsibilities.").  We overrule TAA's fourth issue.

**TCEQ's Changes to the ALJ's Findings of Fact**

In its fifth issue, TAA argues that TCEQ "lacked the authority to change the ALJ's finding of fact regarding no violation of 40 C.F.R. § 122.26(c) and 30 [Tex. Admin. Code]

---

[6] As support for its position that only stormwater discharges from a point source require a general permit, TAA cites *Decker v. Northwest Environmental Defense Center*, 568 U.S. 597 (2013).  That case, however, concerned whether discharges of channeled storm water runoff from two logging roads required permit under a former version of the federal regulation, and the United States Supreme Court concluded that they did not because the storm water in that situation had not been shown to be "associated with industrial activity."  *Id.* at 611–12.  In contrast, there was evidence before TCEQ that storm water runoff was associated with TAA's mining operations at the Site.

§ 281.25(a)(4)." TAA contends that TCEQ's changes violated section 2001.058(e) of the APA *See* Tex. Gov't Code § 2001.058(e) (limiting when state agency may change finding of fact or conclusion of law made by ALJ).[7] According to TAA, Subsection 2001.058(e) does not allow TCEQ to ignore the ALJ's "findings on pure questions of fact." The Texas Supreme Court, however, has concluded that TCEQ is not subject to Subsection 2001.058(e), but that it is subject to Subsection 2003.047(m), "a self-contained grant of authority specifically crafted for TCEQ." *See Dyer v. Texas Comm'n on Env't Quality*, 646 S.W.3d 498, 511 (Tex. 2022). "Section 2003.047(m) provides TCEQ with a specific grant of broad authority to amend a proposal for decision, including any finding of fact, so long as TCEQ bases the amendment solely on the record and explains itself." *Id.* at 512.

TCEQ's order explained the changes to the ALJ's findings as to the TCEQ rule and adopted federal regulation as follows:

---

[7] Section 2001.058(e) provides:

(e) A state agency may change a finding of fact or conclusion of law made by the administrative law judge, or may vacate or modify an order issued by the administrative judge, *only if* the agency determines:

(1) that the administrative law judge did not properly apply or interpret applicable law, agency rules, written policies provided under Subsection (c), or prior administrative decisions;
(2) that a prior administrative decision on which the administrative law judge relied is incorrect or should be changed; or
(3) that a technical error in a finding of fact should be changed.

The agency shall state in writing the specific reason and legal basis for a change made under this subsection.

Tex. Gov't Code § 2001.058(e) (emphasis added).

21

[TCEQ] disagreed with the ALJ's application or interpretation of applicable law, and determined [TAA] also violated 30 [Tex. Admin. Code] § 281.25(a)(4) and 40 C.F.R. § 122.26. The Commissioners stated that 40 C.F.R. § 122.2 provides that a "discharge, when used without qualification, means the discharge of a pollutant." The definition of "discharge of a pollutant" is what brings the concepts of "point source" and "waters of the United States" into play. However, the definition of "discharge" utilized by the ALJ from 40 C.F.R. § 122.2 only applies "when used without qualification." [TCEQ] found that "storm water discharge associated with industrial activity," is specifically defined in 40 C.F.R. § 122.26(b)(l4), the section alleged to be violated by [TAA], and contains multiple qualifications to the general definition of "discharge." [TCEQ] found that the specific definition of "storm water discharge associated with industrial activity" precludes application of the more general definitions of "discharge" and "discharge of a pollutant" in 40 C.F.R. § 122.2 because it qualifies the definition of discharge. Therefore, [TCEQ] determined that the evidence in the record supported that [TAA] violated not only [Tex. Water Code] § 26.121, but also 30 [Tex. Admin. Code] § 281.25(a)(4) and 40 C.F.R. § 122.26 and the order is therefore modified consistent with the Executive Director's exceptions which include Finding of Fact No. 41, Conclusion of Law Nos. 10, 13, 14, 17, 18, and 23, and Ordering Provision No. l.

Because TAA does not argue that TCEQ's explanation failed to comply with Subsection 2003.047(m), we overrule TAA's fifth issue.[8]

**Arbitrary and Capricious**

In its sixth issue, TAA argues that "TCEQ's order is arbitrary and capricious because it fails to include the owner of the property at issue and orders remedial action by a former lessee that ceased to have any legal interest in the property before the TCEQ initiated its

---

[8]  Further, even if TAA had challenged TCEQ's changes and explanation under Subsection 2003.047(m), we would conclude that TCEQ's changes and explanation complied with that subsection. *See* Tex. Gov't Code § 2003.047(m); *Dyer v. Texas Comm'n on Env't Quality*, 646 S.W.3d 498, 513 (Tex. 2022) (concluding that TCEQ's explanation of changes to PDF satisfied Subsection 2003.047(m)'s "explanation requirement" because "explanation section adequately provided TCEQ's bases of disagreement with SOAH's analysis" and allowed petitioners "to intelligently prepare their appeal" and reviewing courts "to examine TCEQ's evidentiary basis for granting TexCom's permits").

enforcement action." As part of this issue, TAA also challenges the ordered corrective action. TAA was ordered to:

> a. immediately cease all unauthorized discharges at the site by removing equipment and stabilizing the Site and returning it to a post mining use consistent with the MSGP; or
>
> b. within 30 days after the effective date of this order 1) develop and implement a storm water pollution prevention plan in accordance with TPDES GP No. TXR050000; and 2) submit an NOI requesting coverage under TPDES GP No. TXR050000 and associated fees, . . .

TAA argues that TCEQ's decision was arbitrary and capricious because it requires TAA to take corrective action at the site when it no longer has a leasehold interest.

In general, an agency's decision is arbitrary and capricious or results from an abuse of discretion if the agency failed to consider a factor that the Legislature directed it to consider, considered an irrelevant factor, or weighed only relevant factors but still reached a completely unreasonable result. *City of El Paso v. Public Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994); *see also Heritage on San Gabriel Homeowners Ass'n*, 393 S.W.3d at 423 (explaining that agency acts arbitrarily when it makes decision "without regard for the facts" or "relies on fact findings that are not supported by any evidence" or "if there does not appear to be a rational connection between the facts and the decision").

TAA relies on a certificate of compliance that it submitted to TCEQ on February 28, 2018; TCEQ's finding of fact that it was not engaged in active excavation or mining operations in the Blue Pit after October 1, 2014; and evidence that it had relinquished its lease. But our review of TCEQ's final order is limited to the evidence in the administrative record. *See* Tex. Water Code § 7.064 (providing judicial review of TCEQ enforcement order under APA); Tex. Gov't Code § 2001.175(e) (generally limiting review to administrative

23

record).  In this case, the administrative record on which TCEQ's decision is based does not include evidence that TAA is no longer the lessee or the certificate of compliance that was submitted to TCEQ in February 2018.

After the conclusion of the contested-case hearing, TAA moved to reopen the evidentiary record, but TCEQ did not grant its motion.  *See* 1 Tex. Admin. Code § 155.425(e) (State Office of Admin. Hearings, Procedure at Hearing) (stating that evidentiary record closes at later of end of hearing or date final brief is due); 30 Tex. Admin. Code § 80.265 (Tex. Comm'n on Env't Quality, Reopening the Record) (authorizing TCEQ, on motion of party or own motion, to order ALJ to reopen record for further proceedings on specific issues in dispute).  TAA also filed a motion with the trial court to supplement the administrative record and attached the certificate of compliance to that motion but conceded that the certificate was not presented in the administrative proceeding until after the evidentiary record had closed.[9]

Based on our review of the administrative record, including the evidence that at least one piece of equipment remained at the site, we cannot conclude that TCEQ's order was arbitrary and capricious.  Thus, we overrule TAA's fifth issue.

---

[9] In essence, TAA's argument concerning the certificate of compliance is a complaint about TCEQ's conduct after the final order, which conduct is not subject to judicial review in this case.  *See* Tex. Water Code § 5.351 (addressing judicial review of TCEQ's acts); *Texas Comm'n on Env't Quality v. Sierra Club*, No. 03-12-00625-CV, 2014 Tex. App. LEXIS 2648, at *11 (Tex. App.—Austin Mar. 7, 2014, no pet.) (mem. op.) (holding that trial court did not have jurisdiction to review TCEQ's letter because it was agency action or inaction that was not subject to review under section 5.351 of Texas Water Code).

**CONCLUSION**

Having overruled TAA's issues, we affirm the trial court's final judgment affirming TCEQ's order assessing an administrative penalty of $4,500 against TAA and requiring corrective action.

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Kelly and Theofanis

Affirmed

Filed: December 7, 2023